```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
 2                          TYLER DIVISION

 3  RJ REYNOLDS TOBACCO COMPANY,      )(   CIVIL ACTION NO.
    et al.,                           )(   6:20-cv-00176-JCB
 4              PLAINTIFFS,            )(
                                      )(
 5       versus                       )(
                                      )(   TYLER, TEXAS
 6  UNITED STATES FOOD AND DRUG       )(   DECEMBER 11, 2020
    ADMINISTRATION, et al.;           )(
 7                                    )(
    UNITED STATES DEPARTMENT OF       )(   TELEPHONIC HEARING
 8  HEALTH AND HUMAN SERVICES;        )(
                                      )(
 9  STEPHEN M. HAHN, in his           )(
    official capacity as              )(
10  Commissioner of the United        )(
    States Food and Drug              )(
11  Administration; and               )(
                                      )(
12  ALEX M. AZAR II, in his           )(
    official capacity as              )(
13  Secretary of the United           )(
    States Department of Health       )(
14        and Human Services;         )(
                                      )(
15              DEFENDANTS.           )(
    _____
16
                     TRANSCRIPT OF PROCEEDINGS
17           TELEPHONIC HEARING - MORNING SESSION
          BEFORE THE HONORABLE JUDGE J. CAMPBELL BARKER
18                UNITED STATES DISTRICT JUDGE

19

20  SUSAN ZIELIE, FCRR, RMR
    FEDERAL OFFICIAL STENOGRAPHIC COURT REPORTER
21  United States District Court
    Eastern District of Texas
22  Tyler Division
    211 West Ferguson Street
23  Tyler, Texas  75701
    (903) 590-1065
24  susan_zielie@txed.uscourts.gov

25  APPEARANCES:
```

```
1          FOR PLAINTIFFS - RJ REYNOLDS TOBACCO COMPANY;
                          IS LIKE YOU INC.; NEOCOM, INC.; RANGILA
2                         ENTERPRISES, INC.; RANGILA, LLC; SAHIL
                          ISMAIL, INC.; SANTA FE NATURAL TOBACCO
3                         COMPANY, INC.:

4          RYAN J. WATSON, ESQ.
           JONES DAY
5          51 Louisiana Avenue NW
           Washington, DC 20001-2113
6          202-879-3939
           Rwatson@jonesday.com
7
           FOR PLAINTIFF - ITG Brands:
8
           PHILIP PERRY, ESQ.
9          LATHAM & WATKINS, LLP
           555 Eleventh Street NW
10         Suite 1000
           Washington, DC 20004
11         202-637-2200
           philip.perry@lw.com
12
           FOR PLAINTIFFS - LIGGETT GROUP, LLC:
13
           NANCY KASCHEL, ESQ.
14         KASOWITZ BENSON TORRES, LLC
           1633 Broadway
15         New York, NY 10019
           212-506-1785
16         NKaschel@kasowitz.com

17         FOR DEFENDANTS - UNITED STATES DEPARTMENT OF HEALTH and
                        HUMAN SERVICES:
18
           MICHAEL BAER, ESQ.
19         STEPHEN PEZZI, ESQ.
           ERIC BECKENHAUER, ESQ.
20         US Department of Justice - Federal Programs Branch
           1100 L Street NW
21         Washington, DC 20005
           202-305-8576
22         michael.h.baer@usdoj.gov

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            TYLER, TEXAS; FRIDAY, DECEMBER 11, 2020
 3                        MORNING SESSION
 4        THE COURT:  Good morning.  This is Judge Barker, and we
 5  are here for a telephonic hearing on the motions for summary
 6  judgment and a motion for preliminary injunction in Case Number
 7  6:20-cv-176, RJ Reynolds Tobacco Company, et al., versus the
 8  United States Food and Drug Administration, et al.
 9            Will counsel for the parties please announce yourselves.
10        MR. WATSON:  Good morning, Your Honor.  This is Ryan
11  Watson.  I represent plaintiff RJ Reynolds Tobacco Company,
12  Santa Fe Natural Tobacco Company, and the retailer plaintiffs.
13  And I will be arguing today on behalf of the plaintiffs.
14        MR. BAER:  Good morning.
15        MR. PERRY:  Good morning, Your Honor.  This is Phil
16  Perry for ITG brands.
17        MS. KASCHEL:  Good morning, Your Honor.  This is Nancy
18  Kaschel representing --
19        [INAUDIBLE]
20        THE COURT:  I'm sorry.  The last person who spoke, on my
21  end, at least, your line was choppy.  Could you repeat
22  yourself?
23        [INAUDIBLE]
24        THE COURT:  Well, may I ask:  Can the court reporter
25  hear all of the parties?
```

1          [STENOGRAPHIC COURT REPORTER CLARIFICATION]

2          THE COURT:  It seems like we have a technical issue with

3     the last speaker.  I'm unable to hear you as well.

4          Would you try one more time to make your appearance.

09:03AM  5          MS. KASCHEL:  Your Honor, this is Nancy Kaschel for

6     Liggett.

7          THE COURT:  Very good.  Now I can hear you.

8          And the court reporter?

9          [STENOGRAPHIC COURT REPORTER CLARIFICATION]

09:03AM 10          THE COURT:  Very good.

11          And for the defendants.

12          MR. BAER:  Good morning, Your Honor.  This is Michael

13     Baer from the Department of Justice on behalf of the

14     defendants.  And I'm joined on the public line by my colleagues

09:03AM 15     Stephen Pezzi and Eric Beckenhauer from the Department of

16     Justice, along with colleagues from the Food and Drug

17     Administration.

18          THE COURT:  Very good.  Thank you.

19          I assume that that completes all parties, outside of

09:03AM 20     court personnel, who are on the speaking line.  But if there's

21     anyone else on the speaking line besides court personnel,

22     please announce yourself now.

23          [NO RESPONSE]

24          THE COURT:  Very good.  Hearing no one.

09:04AM 25          Let me walk through a few more preliminaries -- and

1    confirm that the court reporter could hear all of the counsel

2    who just announced their appearance?

3            [STENOGRAPHIC COURT REPORTER CLARIFICATION]

4            THE COURT:  Let me remind everyone of a few protocols to

09:04AM  5    make today's hearing go smoothly.

6            Thank you for your accommodation of participation by

7    telephone during the Coronavirus pandemic.

8            We should all be sure to take care to speak slowly and

9    clearly so that we can all be heard by each other and by the

09:04AM 10    court reporter during today's hearing.

11            To please mute your line when you are not speaking to

12    reduce any background noise or feedback and to avoid speaking

13    over each other when at all possible.

14            And, in general, at least during the first part of the

09:04AM 15    hearing, to please announce your name before you speak, for the

16    benefit of the court reporter and myself and anyone else

17    listening who might not be readily familiar with each of your

18    voices.

19            I detailed some more hearing protocols in my order

09:05AM 20    setting this hearing.  Please adhere to those as well.

21            Let me start with a few ground-clearing questions.  I

22    understand that plaintiffs have moved for a preliminary

23    injunction; and that their complaint, of course, seeks a

24    permanent injunction.  We have now arrived at the point of

09:05AM 25    complete briefing on cross-motions for summary judgment on the

1   request for declaratory relief and a permanent injunction, so I

2   want to spend a minute asking about the necessity to engage

3   with the preliminary injunction standards at this point, or

4   whether both parties agree that the merits of the case can be

09:06AM   5   fully resolved on the cross-motions for summary judgment.

6         As you recall, I did grant the parties' joint request to

7   dispense with a statement in their summary judgment motions of

8   any genuine issues of material fact because the parties agreed

9   the case could be resolved on the cross-motions for summary

09:06AM   10   judgment on the administrative record alone.  I want to make

11   sure that that is still the parties' agreement.

12         So on behalf of the plaintiffs, Mr. Watson, do the

13   plaintiffs agree that there are no genuine issues of material

14   fact to be resolved before the Court can decide the merits of

09:06AM   15   this matter, either way?

16         MR. WATSON:  Thank you, Your Honor.

17         We continue to agree that this case can be resolved as a

18   legal matter the judicial review testing whether the agency

19   action is consistent with law, and that does include the

09:07AM   20   assessment of the certain issues in the administrative record

21   under the Fifth Circuit precedent that is appropriately handled

22   at summary judgment as a legal matter.

23         THE COURT:  So do plaintiffs agree that at this

24   juncture, now that we have the cross-motions and administrative

09:07AM   25   record, the Court's focus should be on the merits of the

1    challenges, and, of course, any standards for permanent

2    injunctive relief, as opposed to preliminary injunctive relief?

3    In other words, do you agree that we've moved past the need to

4    assess the preliminary injunction standard specifically?

09:07AM  5           MR. WATSON:  Thank you, Your Honor.  This is Mr. Watson

6    again.

7           And as to that question, I do know both the preliminary

8    injunction and cross-motions for summary judgment are fully

9    briefed, and we are continuing to seek a preliminary injunction

09:07AM 10   which would enjoin the rule until 15 months after the

11   plaintiff's claims are resolved on the merits.  I'm happy to

12   discuss why that is the case, but we are continuing to seek

13   that relief.

14          It certainly is within the Court's discretion to proceed

09:08AM 15   directly to the summary judgment motions and to resolve the

16   case on that basis now.  It also would be within the Court's

17   discretion to issue a preliminary injunction relatively on the

18   sooner side and then take longer to issue a summary judgment

19   decision.

09:08AM 20          THE COURT:  Fair enough.  I do think I understand what

21   you're saying there.

22          Let me ask for the defendants to respond, to make sure I

23   understand the parties' views on the procedural posture.  Do

24   the defendants still agree, as they did when they filed the

09:08AM 25   joint motion to excuse any statement of genuine issues of

1   material fact, do the defendants still agree that there are no

2   genuine issues of material fact to be resolved before the Court

3   can resolve the merits of this matter, one way or another, on

4   the cross-motions for summary judgment?

09:09AM   5          MR. BAER:  Yes, Your Honor.  Defendants agree with that,

6   and they agree that this case raises purely legal questions by

7   virtue of its posture arising on the basis of an administrative

8   record.  And we, therefore, agree that it is appropriate for

9   the Court to proceed directly to the merits and to the

09:09AM  10   resolution of the cross-motions for summary judgment.

11          THE COURT:  Very good.  Thank you.

12          And one more ground-clearing question.  This is for the

13   plaintiffs, and this is with respect to your statement,

14   Mr. Watson, about your request for injunctive relief that would

09:09AM  15   last for some period of time, independent of the Court's ruling

16   on the merits.

17          Given the Court's recent order extending the stay of the

18   agency's rule's effectiveness, when would the plaintiffs again

19   face imminent compliance cost that will prompt them, if there

09:10AM  20   is no merits ruling at that point and no injunction, that would

21   prompt the plaintiffs to seek another stay the rule's

22   effectiveness?

23          MR. WATSON:  Your Honor, I believe that that would be

24   approximately March of 2021, which is 90 days after the date

09:10AM  25   that I had given you when we had the status conference a few

1    weeks ago, at which point I picked that time period as

2    December 2020.  So, essentially, 90 days out from what we

3    discussed the last time.

4          THE COURT:  All right.

09:10AM  5          So, if by March of 2021, the Court were able to rule on

6    the merits of the challenges in the summary judgment posture,

7    then at that point, however the Court ruled, that would moot

8    your request for a preliminary injunction; correct?

9          To spell that out and unwind it a little bit, assuming,

09:11AM 10   arguendo, the Court order rules for plaintiffs, you would at

11   that point have been requesting a declaration and a permanent

12   injunction, as opposed to a preliminary injunction.  And

13   assuming, arguendo, that the Court were to rule for defendants,

14   then, necessarily, the request for a preliminary injunction

09:11AM 15   would be overtaken by events, because on that hypothetical

16   outcome there would be no likelihood of success for the

17   plaintiffs.

18         So to abstract my question again, if the Court were able

19   to rule by March of 2021 on summary judgment, fully resolving

09:11AM 20   the merits, one way or the other, that would simply moot the

21   necessity to engage with the elements for a preliminary

22   injunction; am I understanding that correctly, Mr. Watson?

23         MR. WATSON:  Yes.  That is absolutely my understanding,

24   based on the facts as they currently stand.  And at that point,

09:12AM 25   the injunctive relief that we would be seeking is a permanent

 1    injunction that enjoins the rule until 15 months after the

 2    claims are resolved.

 3             THE COURT:  Very good.

 4             Mr. Baer, am I understanding that procedural posture of

09:12AM  5    the case correctly in your view as well?

 6             MR. BAER:  Yes, Your Honor.

 7             And I would just note for the record that, of course,

 8    all of these considerations are contingent upon a finding that

 9    venue is appropriate in this district.  I don't intend to bring

09:12AM 10    up the venue issue at any other point in this morning's

11    argument.  But I would just note that we're proceeding,

12    assuming, arguendo, that the Court were to deny the defendant's

13    pending motion to dismiss; or, in the alternative, transfer

14    venue.

09:12AM 15             THE COURT:  Very well.  So noted.

16             Let me move on then to the merits of the competing

17    motions for summary judgment.  Let me start with the

18    plaintiffs.

19             I'm not going to set a firm time limit, but I will ask

09:13AM 20    you to give, essentially, your opening argument, and then I

21    will jump in with questions as appropriate.  If could you start

22    with your First Amendment challenge, please.

23             MR. WATSON:  Yes.  Thank you, Your Honor.  And may it

24    please the Court.

09:13AM 25             As the briefs explained, the rule is invalid in its

1    entirely because it violates the First Amendment in

2    unprecedented and egregious ways.  The government seeks to

3    require exaggerated warnings that feature large and grotesque

4    images to be included on cigarette packs and advertisements.

09:13AM  5    Never before in American history has such warnings been upheld.

6    And, indeed, the only time the government tried -- which was in

7    the FDA's 2011 Graphic Warnings Rule -- the Court held that

8    they were unconstitutional.  Likewise, here, the government has

9    again failed to justify this extraordinary imposition on

09:13AM 10    plaintiff's speech.

11         First, the government does not claim that the warnings

12    will have any real-world impact.  Indeed, its own data from the

13    previous rule and the record evidence relating to this rule

14    show that the warnings would not have any impact on smoking

09:14AM 15    rates.  Instead, we only --

16         THE COURT:  Mr. Watson, let me stop you there.  The

17    government argued that the real-world impact that the warnings

18    would have is heightened consumer education either of the risk

19    in general or of the specific risk of smoking tobacco

09:14AM 20    cigarettes.  Can you respond why that is not a sufficient

21    real-world in that?

22         MR. WATSON:  Because in this case, Your Honor, the

23    real-world impact in terms of affecting smoking rates is

24    something that FDA tried to prove last time and failed, and

09:14AM 25    admittedly failed, and the Court held that it had failed.  And

1   this time the FDA is not even attempting to do that.  So it's

2   an academic interest in conveying certain information for the

3   sake of information, while we know that the government doesn't

4   even claim that it will affect smoke rates, and there's

09:15AM   5   evidence in the administrative record demonstrating that it

6   will not, in fact, affect smoking rates.

7        THE COURT:  Now, the statute itself, the Tobacco Control

8   Act, doesn't that tag the agency's ability to act to findings

9   that certain changes to the labeling would better promote

09:15AM   10   public understanding of the health and safety risks of smoking,

11   and isn't that enough to show that at least Congress thought

12   that better consumer understanding was a tangible real-world

13   outcome?

14        MR. WATSON:  Your Honor is correct, that the statutory

09:15AM   15   provision relating to the changes to textural warnings does

16   refer to that.  But as the DC Circuit found in the *RJ Reynolds*

17   case in 2012, and as the *Cigar Association* case from the DC

18   Circuit this year again emphasized, the purpose that Congress

19   had for the statute is to reduce smoking rates.  And, here,

09:16AM   20   that's something that the government did not even consider, how

21   its warnings would affect smoking rates, and conceivably cannot

22   demonstrate that, and it is our contention that that is the

23   interest that Congress envisioned and that FDA could be

24   pursuing but for the fact that they cannot demonstrate it.  The

09:16AM   25   informational interest that they have asserted here, in our

 1    view, is not constitutionally sufficient.

 2         And I think it is worth just refining the particular

 3    informational interest that is being asserted here.  FDA is not

 4    claiming that the rule will impact smoking rates, for which we

09:16AM  5    just discussed.  It's also not claiming that the rule is

 6    intended to increase knowledge about the general harms of

 7    smoking or that it is intended to communicate absolute relative

 8    or dose response risk of smoking.  Instead, it is asserting an

 9    interest in promoting understanding of the specific granular

09:17AM 10    consequences that are depicted in these particular graphic

11    warnings.

12         THE COURT:  Well, this is a little more abstract than

13    the point you were making, but let me ask you about the

14    government's interest in preventing consumer deception.  Do you

09:17AM 15    agree that that would qualify as a substantial interest under

16    the *Zauderer* test?

17         MR. WATSON:  We do agree that that would qualify as an

18    appropriate interest under the *Zauderer* framework.  And,

19    indeed, that is the only interest, in our view, that can be

09:17AM 20    asserted under the *Zauderer* framework.  And if the government

21    cannot show that that interest is applicable here -- which, in

22    our view, it can't -- then *Zauderer* is categorically

23    inapplicable.

24         THE COURT:  My next question then is:  Do you agree that

09:18AM 25    reducing or eliminating consumer deception is simply one

1    species of promoting consumer understanding?  That those are

2    just two sides of the same coin?

3             MR. WATSON:  No.  We think that those are two different

4    interests, and I'm happy to explain why.

09:18AM  5        When the Supreme Court in *Zauderer* itself was addressing

6    the interest in preventing consumer deception, and the other

7    cases as well, including *Test Masters* and *Milavetz*, these are

8    all situations where the commercial speech at issue was

9    deceptive or potentially misleading, and the compelled

09:18AM 10   disclosure was going to remedy the deception that appeared in

11   that particular advertisement or that particular piece of

12   commercial speech at issue.

13            So in the *Zauderer* case, for example, the attorney

14   wanted to run an advertisement seeking prospective plaintiffs

09:19AM 15   and telling them that if they lost the case they would not have

16   any financial responsibility.  That was potentially misleading

17   because he did, in fact, plan to charge them for the costs but

18   not the fees of the case, and, thus, the disclosure that was

19   being compelled remedied that potential confusion.

09:19AM 20            So the preventing consumer deception rationale that is

21   applicable under *Zauderer* is not a free-floating consumer

22   deception rationale, but, rather, it is tied specifically to

23   correcting the potentially misleading issue that is created by

24   the commercial speech in that instance.

09:19AM 25            THE COURT:  Can the government act under *Zauderer* to

1   remedy potential consumer deception that arises from a shared

2   public understanding or past disinformation campaigns?

3          MR. WATSON:  As to past disinformation campaigns, just

4   as an initial matter, we do not agree that we made

09:20AM 5   misrepresentations historically, and the administrative record

6   does not directly address that issue.

7          But, here, it is established as a matter of the record

8   that the public knows that cigarettes are harmful, and the

9   government has not shown that the public remains mislead about

09:20AM 10   any alleged misrepresentations, let alone any

11   misrepresentations about these particular issues that are being

12   discussed in these warnings.

13          I would also note on the historical alleged

14   misrepresentations point that the retailer plaintiffs

09:20AM 15   conceivably have not made any misrepresentations, and so that

16   rationale would not even apply to all of the plaintiffs in this

17   case.

18          And again, we contend that the *Zauderer* standard does

19   not encompass that situation because *Zauderer* is limited to

09:21AM 20   correcting the deception in the particular speech at issue, and

21   it's undisputed that the current advertising and its packages

22   are not misleading, and that's not the basis upon which this

23   rule was issued.  And, in fact, the Tobacco Control Act

24   separately prohibits any such misleading statement in the

09:21AM 25   current packages and advertising.

1          THE COURT:  And when you say that the FDA has not

2     attempted to show that these warnings would lead to a reduction

3     in smoking, your baseline for that is a reduction from current

4     percentages of adults or people who smoke; correct?

09:22AM  5          MR. WATSON:  Correct.

6          THE COURT:  What do you say to the defendant's

7     suggestion that Congress's interest in reducing smoking rates,

8     not from necessarily current levels but from what the rates

9     would otherwise have been without any warnings at all?

09:22AM 10          MR. WATSON:  That notion, if embraced, would be

11     inconsistent with the way that the First Amendment litigation

12     proceeds.  That it is the government's burden to demonstrate

13     that the burden that it is imposing here, the compelled speech,

14     is justified by the adequate type of interest and demonstrating

09:22AM 15     that the rule would sufficiently and materially advance that

16     interest without being unduly burdensome, that standard cannot

17     be satisfied if it is being pegged to getting smoking rates to

18     something better than they were at some point in the past.  The

19     First Amendment burden that this rule creates is being imposed

09:23AM 20     now.  Or, obviously, once the rule takes effect, it will be

21     even more so.  That burden, under the First Amendment standard,

22     has to be weighed against any current benefits that the rule

23     would deliver, not any notion that it is making things better

24     than they were in the 1960s.

09:23AM 25          THE COURT:  I guess my question is more targeted just

1   based on what is a sufficient substantial interest if *Zauderer*

2   did apply or under the *Zauderer* framework.  Courts sometimes

3   hold that the government doesn't have to tackle all aspects of

4   the problem at once and can move incrementally.

09:23AM  5      So it is your position that it would not be a

6   substantial interest to reduce smoking rates from what they

7   would otherwise be without any warnings; that we have to focus

8   only on the specific incremental addition to the warnings that

9   are at issue here?

09:24AM 10      MR. WATSON:  The baseline that this rule has to be

11   evaluated against is the status quo as it currently exists,

12   which involves the surgeon general's warnings that have been on

13   the packs for a number of years.  That is what they need to

14   show that they are materially improving.  And we would say they

09:24AM 15   need to show they're materially improving by showing a

16   reduction of smoking rates, not just some academic

17   informational interest.  But in any event, the baseline is the

18   status quo as it currently stands.

19      The FDA is proposing to create a new and more onerous

09:24AM 20   burden on the First Amendment going forward.  And to justify

21   that, they need to, among other things, show that they are

22   going to materially advance a sufficient interest going

23   forward, as measured against the current status quo with the

24   current surgeon general warning.

09:25AM 25      THE COURT:  Staying on the framework question a little

1    bit before getting into some of the specifics of this rule, let

2    me ask you to respond to the government's argument about the

3    Sixth Circuit *Discount Tobacco* case.  I have two questions

4    about that.

09:25AM  5          First, in *Discount Tobacco*, Judge Stranch suggested that

6    the purely factual and non-controversial disclosure requirement

7    was not a standalone requirement under *Zauderer*, but rather

8    this language appears in *Zauderer* once, and the context of its

9    appearance does not suggest that the Court was describing

09:25AM 10   necessary characteristics of a disclosure.

11         Can I ask for the plaintiff's view on whether that is

12   accurate or inaccurate.

13         MR. WATSON:  To address the question specifically, and

14   then maybe I'll circle back to *Discount Tobacco* a little bit

09:26AM 15   more broadly.  The way that we understand the purely factual

16   inquiry to work is that that is a threshold requirement that

17   must be satisfied in order to trigger *Zauderer* review.  The

18   case law is somewhat inconsistent on whether the purely factual

19   element is a threshold requirement that must be satisfied to

09:26AM 20   trigger *Zauderer* or whether it is, in fact, an element of the

21   *Zauderer* test.  And the government's opening brief framed it in

22   the latter way, and ours framed it in the former way.  But

23   that's how we understand the purely factual element to work.

24         I would say that another important thing to understand

09:26AM 25   about *Discount Tobacco* is that it was applying a now outdated

1    and abrogated standard under *Zauderer*.  *Discount Tobacco* said

2    that *Zauderer* was a, quote, rational basis standard.  It has

3    also specifically said that the court was not required to

4    specifically analyze whether the warnings were unduly

09:27AM  5    burdensome or unjustified.  And as demonstrated by the *NIFLA*

6    case from the Supreme Court last year, at pages 2,376 to 2,377,

7    that is now an understanding of *Zauderer* that has been

8    abrogated by the Supreme Court.  And, thus, we think *Discount*

9    *Tobacco*'s analysis has no real persuasive effect here.

09:27AM  10         THE COURT:  And the government also argued that,

11   regardless of any persuasive effect, it has an issue preclusion

12   effect as to RJ Reynolds because it was a party there.  Would

13   you briefly give your response to that argument.

14        MR. WATSON:  Yes.  I'd be happy to.  And there are three

09:27AM  15   main points I think that are important to understand in

16   response to that question.

17        The first is that the government has forfeited any

18   preclusion argument here because it raised this claim

19   preclusion point with a one-sentence footnote, with no

09:28AM  20   citations, and it never raised issue preclusion

21        Secondly, the parties in this case are not the same.

22   Thus, preclusion doesn't apply.

23        So claim preclusion is limited to successive litigation,

24   the very same claim by the same paries.  *Whole Woman's Health*

09:28AM  25   stands for that proposition.  And a similar requirement applies

1    to issue preclusion under *Taylor versus Sturgell*.

2          Here, there are a number of plaintiffs that were not

3    plaintiffs in the *Discount Tobacco* case, including Liggett,

4    including the retailer plaintiffs.  And, thus, even if the

5    relevance claims were precluded -- which they are not -- the

6    other claims would not be.

7          And then the third of the three points is that

8    intervening factual and legal developments since *Discount*

9    *Tobacco* make both claim preclusion and issue preclusion

10   inapplicable even as to Reynolds.

11         As to the factual development, this is a situation like

12   *Whole Woman's Health*, the Supreme Court decision, which said

13   that when individuals claim that a particular statute is going

14   to produce serious constitutional adverse consequences before

15   they have actually occurred, and when the courts doubt that

16   that's actually going to happen, the factual difference years

17   later that those adverse consequences have, in fact, occurred

18   can make all the difference; and, thus, claim preclusion

19   doesn't apply in that situation.

20         And so as to the intervening case law, it's the point

21   that I just made a moment ago that *NIFLA* makes *Discount Tobacco*

22   decision a relic and renders it an incorrect statement of the

23   current First Amendment doctrine; and, thus, issue preclusion

24   and claim preclusion are inapplicable.

25         I'm happy to give citations for the notion that claim

1    preclusion ask issue preclusion don't apply when there's an

2    intervening change in law on a constitutional issue like this,

3    but I'll stop and pause here to see whether that would be

4    helpful to the Court.

09:30AM 5        THE COURT:  Well, I think maybe a better use of our time

6    this morning would be for me to move on to questions about the

7    rest of the First Amendment issue.

8        On the purely factual and uncontroversial prong of the

9    *Zauderer* test, is plaintiff's position that -- let me ask it

09:30AM 10   this way:

11       The government, I think at page 33 of their opposition,

12   they argue that the plaintiffs do not disagree that the textual

13   warnings in the agency rule are purely factual and

14   uncontroversial, as opposed to text plus the graphics.  Would

09:31AM 15   you clarify your position on that proposition.

16       MR. WATSON:  I would be happy to.  And I will start by

17   just saying:  No, we do not agree with that statement, and I'm

18   happy to elaborate on why.

19       There are actually several arguments that we have as to

09:31AM 20   why the warnings here are not purely factual and are not

21   uncontroversial.

22       THE COURT:  And are you focusing just on the textual

23   warnings?

24       MR. WATSON:  I intend to, yes.

09:31AM 25       THE COURT:  Okay.  Very good.  Thank you.

1          Please proceed.

2          MR. WATSON:  Okay.  Yes.

3          So we do have some of those arguments that are focused

4     on the images as well.

09:31AM  5          But as to the textual warnings, there are a couple of

6     things to note.  One is that the warnings here are

7     controversial because they are misleading and exaggerated.  And

8     under *RJR, American Meat Institute and Entertainment Software*,

9     that renders warnings controversial.  And, here, we contend --

09:32AM 10    and we explain why the warnings, not just the images but also

11    the text -- are misleading and exaggerated.

12          The government didn't even test whether the warnings

13    conveyed accurate messages.  But we fleshed out in our briefs

14    at pages 26 to 27 of our opening motion and pages 13 to 15 of

09:32AM 15    our reply of why each of the warnings is exaggerated.  And some

16    of those, to be sure, addressed images, but some were

17    addressing factual points as well.

18          For example, the textual statement's use of causal

19    language is misleading and subject to misinterpretation.  They

09:32AM 20    use -- many of them use the term "causes" rather than saying

21    "may cause" or "can cause."

22          And the FDA's own first qualitative study found -- in

23    fact, its most prevalent finding -- was that participants had a

24    negative reaction to that, and that that was confusing, and

09:33AM 25    they found that to be not credible.

1     Also, the warnings, many of them focus on less frequent

2     negative health consequences and portray them as things that,

3     although they are in fact rare, they portrayed them as things

4     that would happen in the common case, and that is a problem

09:33AM 5     that affects both images and text here.

6         One example of that is the cataracts warning which talks

7     about blindness as a result of the cataracts, and the text is

8     doing this as well as the image.  In fact, blindness occurs in

9     only 0.48 percent of US cataract patients, which is rare, but

09:33AM 10     the warning is portraying it as common.  And that's a specific

11     thing that RJR found at page 16 to render the previous warning

12     controversial.  And we think all of the warnings here fall for

13     the same reason.

14         Also, I would --

09:34AM 15     THE COURT:  You do have a dispute as to the

16     uncontroversial element regarding the meaning of causes in the

17     textual warning.  You're saying the degree of causation is not

18     successfully high as to make that statement uncontroversial.

19         What do you do with the FDA's argument that all the

09:34AM 20     textual warnings were selected as among highest level of

21     causation in the surgeon general's study?

22         MR. WATSON:  So the FDA makes that point; but it says --

23     inaccurately, in our view -- at page 6 of its reply brief, that

24     the rule is using the same causal language as the surgeon

09:34AM 25     general's reports.  But that is not accurate.  These warnings

1    don't use the careful surgeon general's report causal language,

2    which is much more nuanced than what the warnings demonstrate

3    here.  I would cite to page 5,868 of the joint appendix for

4    that point.

09:35AM  5        And there is one place that's cited in the surgeon

6    general's report that uses the word "causes" with respect to

7    the diabetes warnings specifically, but it does that as sort of

8    a shorthand, and it does it when referring the reader to

9    another section of the surgeon general's report where it

09:35AM 10   discusses more fully with precise causal language.  And that's

11   at Joint Appendix 6,381 and Joint Appendix 6386.

12        So that point is unpersuasive for various reasons, but

13   the most fundamental one is the warnings here are not

14   replicating the careful causal language that the surgeon

09:35AM 15   general's report is using.

16        THE COURT:  So your dispute with the accuracy of the

17   causal link implied or suggested by the text on the warnings

18   exists with how many of the textual warnings?

19        MR. WATSON:  The majority of the warnings use "causes."

09:36AM 20   I'm happy to run through each of them, but it is the majority

21   of them.

22        THE COURT:  You mentioned cataracts was one.

23        MR. WATSON:  Cataracts is one that uses "causes."  Head

24   and neck cancers does as well.  The "smoking reduces blood flow

09:36AM 25   to the limbs" doesn't use the word "causes" but it uses the

1  word "reduces," which creates a similar use.  Likewise, the

2  erectile dysfunction uses "reduces" rather than "they reduce."

3  The fatal lung disease in non-smokers uses the word "causes."

4  COPD uses the word "causes."  Bladder cancer uses the word

09:37AM 5  "causes."  Diabetes does as well.  The "smoking during

6  pregnancy" uses the word "stunts" rather than "may stunt."

7  Cataracts, which we discussed.  I think that's the end of that

8  list.

9          THE COURT:  In the DC Circuit litigation, the court's

09:37AM 10  2012 panel opinion in the RJ Reynolds versus FDA litigation

11  stated that, there, the companies who were parties in that

12  litigation -- the quote from that opinion is:  The companies do

13  not dispute Congress's authority to require health warnings on

14  cigarette packages, nor do they challenge the substance of any

09:37AM 15  of the nine textual statements mandated by the act.

16          Now, of course, I appreciate that the textual statement

17  at issue here varies in some regards with those mandated by the

18  act, but some of the textual warnings at issue and addressed in

19  that 2012 decision also used the word "cause."  For instance,

09:38AM 20  "cigarettes cause fatal lung disease," "cigarettes cause

21  strokes and heart disease."

22          So let me ask you at least about RJ Reynolds, since it

23  was a party in that litigation and is a party here:  What has

24  changed from that litigation, where there was no dispute with

09:38AM 25  the substance of the textual statements, to the textual

1    statements at issue here?

2        MR. WATSON:  So we are challenging these particular

3    warnings on this particular record.  But we're not saying that

4    the content of the TPA specified warnings is necessarily

5    unconstitutional in all possible future cases, in all possible

6    factual records.

7        And, here, the important thing to distinguish is the

8    factual record that we have here and the specific warnings that

9    we have here.  Only two of the warnings here are precisely the

10   same text that's specified in the Tobacco Control Act, and,

11   thus, the same text precisely that was at issue in the DC

12   Circuit's decision.  There's only two that overlap.

13       THE COURT:  Which two are those, just for the purposes

14   of clarifying our discussion today?

15       MR. WATSON:  Yes.  So the "tobacco smoke can harm your

16   children" warning, and the "tobacco smoke causes fatal lung

17   disease in non-smokers" are the only warnings where the text is

18   exactly the same as the Tobacco Control Act warnings.  So those

19   are the only two.

20       THE COURT:  Just a few moments ago, you gave the second

21   warning, "tobacco smoke causes fatal lung disease in

22   non-smokers" as an example of one where you do challenge the

23   text as not satisfying the purely factual and uncontroversial

24   *Zauderer* element.  Correct?

25       MR. WATSON:  Correct.

1    THE COURT:  And, again, is that a different position

2    than the position that at least RJ Reynolds took as reflected

3    in the DC Circuit 2012 panel opinion, where it stated that:

4    The companies do not, quote, challenge the substance of any of

09:40AM 5    the nine textual statements mandated by the act, end quote?

6    MR. WATSON:  It is different in the sense that we are

7    making that challenge here, whereas we were not making the

8    challenge specifically to the text there.  But it's not

9    different in the sense of being inconsistent, because as I

09:40AM 10   noted a moment ago one of the things that is different now is

11   we have a different administrative record, and even the FDA's

12   only study had the most prevalent finding being that "causes"

13   is a problem.

14   And the "tobacco smoke causes fatal lung disease in

09:41AM 15   non-smokers" text here is also combined with an image that is

16   problematic for reasons I'm happy to discuss, and the FDA did

17   not separately test its images and text as a combination as

18   compared to just the text.  It didn't separately test in that

19   second quantitative study what it would be like to use the text

09:41AM 20   compared to text plus images, and so the only evidence we have

21   here that the FDA produced is the testing as to the text plus

22   images.  And that record evidence demonstrates that, for a host

23   of reasons, that particular warning -- and, indeed, all of them

24   -- are not purely factual and are not uncontroversial.

09:42AM 25   THE COURT:  So the plaintiffs do agree, however, that

1    the controversial or uncontroversial prong of the *Zauderer* test

2    refers to the factual accuracy of the statement, as opposed to

3    whether the statement is disturbing.  Correct?

4         MR. WATSON:  So there's a couple of cases I would point

09:42AM   5    the Court to as to how we understand the controversial prong,

6    which includes the RJR decision which said that:  Graphic

7    warnings that are subjective and perhaps even ideological are

8    controversial.

9         The *National Association of Manufacturing* case from the

09:42AM  10    DC Circuit, at page 530, which said that:  If information is

11    intend to skew public debate or to stigmatize, then that's

12    partly non-ideological and is, thus, controversial.  And the

13    *American Beef Institute* case from the en banc DC Circuit, which

14    said that if it is too one-sided or if it conveys innuendo it

09:43AM  15    is controversial.

16         So we do not think that the assessment of whether a

17    warning is controversial is limited simply to the question of

18    whether it is a medically accurate depiction of the particular

19    consequence that is being described, but, rather, does include

09:43AM  20    a consideration of the sources of the elements I just

21    mentioned.

22         THE COURT:  Right.  But you do agree that there's some

23    factual information -- factual as opposed to opinion, fact

24    assertion of the real-world affect and not a norm -- there's

09:43AM  25    some factual information that is accurate beyond reasonable

1    controversy but it's nonetheless disturbing to learn of just as

2    a state of the way the world works.  Sometimes we learn

3    disturbing but uncontroversial facts; correct?

4         MR. WATSON:  That is certainly true in terms of a

09:44AM 5    statement of how the world works, but there's a difference

6    between warnings that may elicit an emotional response from

7    some segment of the population and warnings that are

8    objectively designed to and, in fact, elicit an emotional and

9    shock response from a significant number of those who view the

09:44AM 10   warnings.

11        And, here, FDA decided to not only use textual warnings,

12   which have been demonstrated to be as effective, but to also

13   include the disturbing and the shocking images.

14        THE COURT:  Would you say, on behalf of plaintiffs, that

09:44AM 15   a skull and crossbones image on poisonous chemicals is

16   controversial because it's disturbing for some people?  It's

17   disturbing for some people to look at a skull and crossbones?

18        MR. WATSON:  Although it would depend on the particular

19   factual record at issue there, I think that adding a skull and

09:45AM 20   crossbones graphic to the word "poison" might not add anything

21   non-factual to the warning, and might help children or

22   non-English speakers to understand the warning.  So I think

23   that it is possible that that is the sort of image that may

24   survive First Amendment review.

09:45AM 25        And, here, just thinking relevant to the particular

1    issue here, perhaps the government could use an image that

2    depicts a warning written in handwriting, which might be more

3    readable and easier to understand than printed text, without

4    adding any elements that are not purely factual and

09:45AM  5    uncontroversial.

6          I would also note that, when thinking about the factual

7    issue, the test is not whether there is some factual component

8    in the warning, but rather the test is whether it is, quote,

9    purely factual.  Here, in our view, that is plainly not

09:46AM 10    satisfied, for a host of reasons.

11          THE COURT:  In the warning that indicates that "tobacco

12    use can lead to death," instead of a picture that is in the

13    rule here, would a picture of a skull and crossbones, with that

14    textual warning, convert it from uncontroversial to

09:46AM 15    controversial, in your view?

16          MR. WATSON:  There are a host of sort of sub-elements to

17    that question.

18          One is:  I can't answer it in the abstract without

19    knowing what the administrative record for such a warning would

09:46AM 20    reveal.  Certainly, skull and crossbones eliminates some of the

21    problems we've identified here.  But without -- again, it is

22    the government's burden under the First Amendment to

23    demonstrate all of these things; and without seeing the record

24    and seeing whether they have carried that burden, I can't fully

09:47AM 25    answer that question.

1    But, yes, a skull and crossbones in general and in the

2 abstract, I agree, could conceivably be the sort of thing that

3 would not run afoul of our arguments, but it's going to depend

4 on the details.

09:47AM 5    Here, we have a study in the administrative record that

6 shows that 86 percent of the respondents believe that the

7 warnings are trying to make people feel afraid, and 85 percent

8 believe that they are trying to shock people, and 75 percent of

9 the smokers think that they're trying to convey the advocacy

09:47AM 10 message that people should not smoke cigarettes.  That is just

11 one of many pieces of evidence in the record here that

12 demonstrate that all of these warnings, both images and text,

13 can't get over the purely factual and uncontroversial hurdle.

14    THE COURT:  If the government does have the legally

09:47AM 15 valid substantial interest under *Zauderer* or *Central Hudson* in

16 increasing or even just maintaining consumer awareness of the

17 health risks of smoking, at that point would you say that

18 having graphics to ensure retention of the message is,

19 nonetheless, not a sufficiently tailored fit for that interest?

09:48AM 20    MR. WATSON:  That's correct.  Even if we assumed,

21 arguendo, that the informational -- academic informational

22 interests that the government is asserting here were

23 substantial and, thus, constitutionally adequate for the

24 purpose of this question, we would still contend that these

09:48AM 25 warnings are unconstitutional, both because they're unjustified

1    -- they're not actually going to materially improve that

2    interest -- and also because they are unduly burdensome, they

3    are imposing too much of a burden that's broader than

4    reasonably necessary.  And under *NIFLA* that is enough -- even

09:49AM  5    under the *Zauderer* standard -- to invalidate these warnings.

6         I'm happy to elaborate and would enjoy the opportunity

7    to elaborate on those, if the Court is interested.

8         THE COURT:  Let me move to a little bit different prong

9    of the test, which is how much time after a history of

09:49AM 10    deceptive advertising is necessary before that history becomes

11   too remote, in plaintiff's view?

12        MR. WATSON:  So, again, we don't think that *Zauderer*

13   encompasses any attempts to correct an alleged historical

14   misrepresentation.  And the government has not made an argument

09:50AM 15   based on the *Warner-Lambert* case based on the DC Circuit here,

16   but that is a case that was cited in the amicus brief.  And

17   that's a case from 1977 that allowed, essentially, a corrective

18   statement to remedy misleading advertising that had occurred in

19   the past about Listerine.

09:50AM 20        THE COURT:  Yes, Listerine.

21        And in that case, did the court require the government

22   to show that the corrective advertisement, stating that

23   Listerine does not cure the cold, did the Court require the

24   government to show that that advertisement would do anything

09:50AM 25   more than promote accurate public understanding of the

1   properties of the product in question?

2       MR. WATSON:  I believe that that case -- which, again,

3   the government is not even invoking here -- was focused on

4   correcting the deception that had happened in the past.  But

09:51AM  5   it's distinguishable because, unlike in that case, there's no

6   specific deceptive claim here, either recent or otherwise, that

7   the graphic warnings and their depiction of negative health

8   consequences are targeted to address, nor is there any evidence

9   that the public remains mislead or confused about any alleged

09:51AM 10   prior deception.  In fact, the public has been warned about the

11  dangers of smoking on cigarette advertising since 1984 and on

12  cigarette packages since the 1960s.

13      And we made detailed arguments about the state of public

14  knowledge at this point in time in our briefing, and, indeed,

09:51AM 15  that is one of the reasons why any informational interest at

16  issue here, even if sufficient, in theory, would not actually

17  materially improve the public's understanding of the risks of

18  smoking.  The public already understands the overall and major

19  risks of smoking.  And, indeed, FDA's own dataset shows that

09:52AM 20  99.5 percent of adult respondents believe that smoking is

21  harmful to health, 94 percent believe it causes lung cancer in

22  smokers, 88 percent believe it causes heart disease in smokers,

23  et cetera.

24      And in addition to the knowledge that exists right now

09:52AM 25  about the overall risks of smoking and the major risks of

1    smoking, which I was just discussing, many of the specific

2    health consequences, the granular consequences that are being

3    addressed in these particular warnings, are also well-known.

4    And I'm happy to run through those as well.  But all of that --

09:52AM  5          THE COURT:  Didn't the FDA also find in the record that

6    the current textual warnings on the side of cigarette packages

7    were failing to reach some consumers?  Essentially, where they

8    were just overlooked?

9          MR. WATSON:  The FDA does state that the surgeon general

09:53AM 10    warnings has become stale, and they may have used the word

11    overlooked.  But they did not -- and this is important to

12    emphasize -- they did not test any less restrictive

13    alternatives.  For example, they did not test whether putting

14    text just on the side of the package with new text would

09:53AM 15    accomplish everything that they hoped to accomplish here

16    without creating the larger First Amendment burden on the

17    plaintiffs.  And against that lack of evidence from the FDA, it

18    had to be contrasted with the affirmative evidence that the

19    plaintiffs put into the administrative record, which involves a

09:53AM 20    study by Dr. Iyengar which showed very few statistically

21    significant differences as to new information conveyed or

22    beliefs about smoking risks, which he compared putting large

23    graphic warnings on 50 percent of the top and the front and the

24    back of the packages, as compared to putting less restrictive

09:54AM 25    warnings on just the side of the package.  And so the

1    government hasn't tested that, even though it has a

2    constitutional duty to do that.

3         By contrast, we affirmatively -- even though it's not

4    our burden -- we affirmatively put in the evidence that

09:54AM  5    demonstrates that there are less restrictive alternatives that

6    would have been, at least, as affective.

7         And also, the surgeon general's warnings, which we're

8    all familiar with, have worked well, so there's no reason to

9    think that new textual warnings on the side of the pack

09:54AM 10    couldn't work well again.

11         One element of Your Honor's question mentioned reaching

12    an adequate number of people, and I think that some of that

13    discussion in the briefing comes up in the context of an

14    informational campaign.  Plaintiffs argue that one of the many

09:55AM 15    less restrictive alternates that FDA needed to consider and

16    should have pursued would be a public information campaign,

17    which FDA is often using in the tobacco context and trumpets as

18    wildly successful.  But if the government intends to impose a

19    novel unprecedented and highly burdensome graphic warnings

09:55AM 20    requirement, it must at least demonstrate that it couldn't

21    achieve those goals through its own speech, like an information

22    campaign.

23         And the government, in response to that, says:  Well, we

24    don't think that an information campaign would reach everybody

09:55AM 25    who would look at a package of cigarettes; and in that sense

1    it's not reaching enough people.

2         And in response to that, I would note, first of all,

3    they cite zero evidence to support that.  It's just a statement

4    by counsel in the brief.  And I would point the Court to the

09:55AM  5    *NIFLA* case from the Supreme Court just last year, which, at

6    page 2,376, invalidated the requirement largely because the

7    state could have used a public information campaign, and it

8    rejected -- the Supreme Court rejected the state's argument

9    that the campaign was not effective, and it rejected that

09:56AM 10    because the state gave no evidence that it was ineffective and

11    because getting a tepid response in response to their campaign

12    was not enough to make it constitutionally insufficient.

13         So I'll pause there, but I thought all of those were

14    implicated by Your Honor's question.

09:56AM 15         THE COURT:  Thank you.

16         Let me move from your narrow tailoring point, which I

17    believe I understand, to, again, back to one final question, I

18    think, on the purely factual and uncontroversial prong where

19    the plaintiffs have argued that the emotional impression left

09:56AM 20    by looking at the images is part of what makes them

21    controversial, not uncontroversial, within the meaning of that

22    test.

23         In her dissent in the 2012 DC Circuit opinion, Judge

24    Rogers argued that that argument by the tobacco companies leads

09:57AM 25    to the counterintuitive conclusion that the more severe the

1  negative health affects of a product the more constrained the

2  government is in mandating disclosure of those risks because

3  the public would be more alarmed at learning those risks.  What

4  is your response to that point?

5  MR. WATSON:  My response to that point is that I

6  fundamentally disagree.  For example, the surgeon general

7  warnings that currently appear on cigarette packages are far

8  more factual than what we're looking at here in this case.

9  They address the same overall issue, which is what are the

10  risks of smoking.  And, indeed, there's evidence that they have

11  helped to improve the way that cigarette smoking in this

12  country -- those are examples of warnings about smoking risks

13  that seem to have worked.  Just because it involves cigarette

14  smoking and serious issues doesn't mean that the government

15  cannot appropriately craft a warning that is purely factual; it

16  just means that they need to actually try to create a warning

17  that is not emotional and shocking and ideological.

18  And, here, they clearly did not try to do that.  And, in

19  fact, there's evidence that they repeatedly revised the images

20  to make them more frightening and more grotesque.

21  It is possible that the government could create new

22  warnings that may be purely factual, but they have not done so

23  here.  And FDA's own qualitative studies show this.  People are

24  reacting to them, saying these are insanely graphic and scare

25  tactics.  In fact, a number of these images are mere parallels

1    to what was in the 2011 rule.  So there are just all sorts of

2    reasons why these ones can't get over the threshold of being

3    purely factual.

4         But I do not agree that it is ham-stringing the

09:59AM  5    government's ability to create warnings about smoking.  It just

6    means that they need to be careful, and they need to comply

7    with the First Amendment and assemble the adequate First

8    Amendment record, and none of that has been done here.

9         And, in fact, here, one of the problems -- which we

09:59AM  10   haven't touched on yet -- is that these sort of realistic

11   images are inherently subject to multiple interpretations,

12   which prevents them from being purely factual.  And the

13   government has the burden to show that they actually are

14   conveying solely and unambiguous factually correct meanings,

10:00AM  15   and it hasn't done that, and hasn't even really attempted to do

16   that.

17        Which is why you have people looking, for example, at

18   the erectile dysfunction warning in the qualitative study and

19   saying:  I think this might be about a strained relationship,

10:00AM  20   or infertility, or insomnia, sleeplessness, stress or

21   depression.  People are confused and they don't understand what

22   message is even being conveyed.  Both the qualitative and

23   quantitative studies demonstrate that, and that is yet another

24   reason why these warnings are not purely factual.

10:00AM  25        But, of course --

1          THE COURT:  Does the government have a substantial

2    interest in including graphics that help communicate the point

3    of a textual warning to those who speak any of the many

4    different languages spoken in our country?

10:01AM  5          MR. WATSON:  We disagree at the threshold that the

6    government has a substantial interest in promulgating warnings

7    that are trying to convey these granular specific consequences

8    of smoking in the first instance.

9          The government does point to the point that Your Honor

10:01AM 10   just made.  But the fact that -- so what the government says is

11   whatever problems are created by the images are fixed by the

12   text.  And I think that's an inconsistency in the government's

13   position, because they elsewhere make the point you just made,

14   which is that although the graphics help people who can't read

10:01AM 15   the warnings very well.  But both of those things can't be

16   true.  And if the warnings images have a problem and the text

17   is supposed to fix them, how does that work with respect to

18   people that can't read the textual warnings?  So I think

19   there's just a cognitive difference in some of those positions

10:02AM 20   on the government's part.

21          THE COURT:  Right.

22          One more question, just on the legal framework here.  To

23   confirm my understanding that, on plaintiff's view, that the

24   *Zauderer* framework is limited to combating consumer deception

10:02AM 25   in the specific commercial speech at issue regarding the

1   disclosure requirement, that view of *Zauderer* framework would

2   be in conflict with the DC Circuit's en banc opinion in AMI;

3   correct?  Not that that's necessarily fatal.  You're in the

4   Fifth Circuit.  But just so I understand, your view would

10:02AM  5   create a circuit conflict if adopted by the Fifth Circuit;

6   correct?

7       MR. WATSON:  It is correct that our position is

8   inconsistent with the DC Circuit's *American Meat* opinion, so I

9   agree in that sense.

10:02AM  10      But I don't know if I agree with the word "create,"

11   which was in the question, because the Fifth Circuit precedent

12   already demonstrates this, in our view.  But it would, I

13   suppose, further the conflict or re-emphasize the conflict.

14      But we're happy to rely on binding Supreme Court and

10:03AM  15   Fifth Circuit precedent for this issue, which we think is

16   clear.  And we think that the DC Circuit opinion was,

17   respectfully, wrongly decided.

18      THE COURT:  I would like to wrap up shortly with your

19   argument, since we've been going for about 60 minutes.  But

10:03AM  20   before I do, would you care to offer any argument this morning

21   on your APA arbitrary and capricious and noticing comment

22   arguments?

23      MR. WATSON:  Yes.  I would very much appreciate the

24   opportunity to do so.

10:03AM  25      In our view, the rule violates the First Amendment and

1    the APA.

2          And as to the APA, the rule is both arbitrary and

3    capricious, and FDA has violated the APA by failing to provide

4    meaningful notice and opportunity to comment.

10:04AM 5          On the arbitrary and capricious point, we flesh out a

6    number of problems in our briefs.  But the one that I might

7    focus on mostly this morning is that FDA conducted a flawed

8    cost benefit analysis and incorporated it into the rule, and

9    that renders it arbitrary and capricious.

10:04AM 10          Here, FDA was obligated to -- but did not -- consider

11   whether the rule would reduce smoking under the APA.  And in

12   the *Cigar Association* decision from the DC Circuit this year,

13   the court said that, quote:  When requiring a product to bear

14   such intrusive and expensive health warnings, it is difficult

10:04AM 15   to image a more important aspect of the problem than whether

16   the warnings will actually affect product usage, unquote.  That

17   is an issue that FDA did not consider in this case, and it is

18   one of several reasons why the cost benefit analysis is flawed.

19          Also, FDA failed to quantify the benefits, which leaves

10:05AM 20   it unable to explain why it chose its approach rather than

21   taking less costly alternatives, such as requiring nine

22   warnings instead of 11.

23          And the break-even approach that was built into the cost

24   benefit analysis is pure speculation, because FDA provided no

10:05AM 25   reason why the informational benefit is worth more than one

1    cent per pack.

2         As I mentioned, there are other reasons why the rule is

3    arbitrary and capricious, but I won't dwell on those for the

4    sake of brevity now.

10:05AM  5         Moving to the notice and comment problem, there are

6    essentially two categories of those problems.

7         The first is that the government has no justification

8    for failing to release these reports, the qualitative study

9    reports, with the proposed rule, and it also has no

10:05AM  10    justification for subsequently giving the public only 15 days

11    to comment on the qualitative study reports.

12         Those reports contained hundreds of pages of technical

13    material that was used to inform FDA's quantitative studies.  A

14    15-day comment period didn't provide meaningful notice and

10:06AM  15    opportunity to comment, and cases such as *National Lifeline*

16    from the DC Circuit and *Texas versus EPA* from the Southern

17    District of Texas in 2019 support that point.

18         The government attempts to draw a distinction, though,

19    between a primary comment period and a so-called supplemental

10:06AM  20    comment period.  But even if such a distinction generally

21    exists -- which I don't think it does -- the FDA was required

22    to release the qualitative study reports in the first instance,

23    and its failure to do so doesn't allow it to benefit from a

24    more lenient standard in any so-called supplemental comment

10:06AM  25    period.

1    The second bucket of our notice and comment argument

2    pertains to the study data, and the government ignores the many

3    cases we've cited for the proposition that FDA was obligated to

4    release the underlying data from the studies to the public

10:07AM  5    during the rule-making process.

6    And on the notice and comment point, and the APA points

7    more generally, some of the briefing is focused on the

8    prejudice question, and so I think it is important to highlight

9    that plaintiffs were prejudiced by both notice and comment

10:07AM 10    violations.  And under the Fifth Circuit standard, agency

11    mistakes are harmless only where they clearly have no bearing

12    on the procedure used or the substance of the decision reached.

13    That's the *Sierra Club* case at 444.

14    And the *City of Arlington* case from the Fifth Circuit

10:07AM 15    also says that courts should consider the likely affect on

16    perceived fairness of the procedural violation that has been

17    found.

18    Here, it has a huge affect on our ability to comment and

19    to challenge the rule for a host of reasons, but just to pick a

10:07AM 20    couple very quickly.

21    Dr. Iyengar did a study -- which we submitted in the

22    administrative record -- that she had had the reports, the

23    qualitative study reports or the data, it would have allowed

24    her to do things such as including questions about whether

10:08AM 25    using "can cause" rather than "causes" would increase

1    believability and decrease confusion.  She also could have used

2    the reports in the data to deepen her testing of whether the

3    warnings provoked negative emotions.

4         Also our medical experts submitted declarations in the

10:08AM 5  administrative record about whether the warnings were

6    misleading, and the qualitative study reports would have helped

7    them to make more robust and move detailed and pervasive

8    declarations if they had had that.

9         We tried to demonstrate in the our opening brief and

10:08AM 10 reply brief the ways that the reports in the data are relevant.

11   That's why we attached an appendix to each of our briefs that

12   contains certain excerpts from the qualitative study materials.

13   And in our reply brief, at which point we had finally gotten

14   the raw data, we actually quoted the raw qualitative data 14

10:09AM 15 times in our reply brief, which demonstrates just how important

16   it was.

17        So those are the reasons that we believe that the rule

18   violates the APA for those, and those in our briefs.

19        THE COURT:  Very good.

10:09AM 20      Mr. Watson, let me ask you one final question.  This is

21   concerning remedy.  Your motion for summary judgment asks for

22   summary judgment that, among other things, enters a permanent

23   injunction against enforcement of the final agency rule under

24   review here.  In the DC Circuit's 2012 opinion, in RJ Reynolds

10:09AM 25 versus FDA, the panel majority held that when a district court

1    determined that the agency acted unlawfully, ordinarily the

2    appropriate course is to remand to the agency.  And so the DC

3    Circuit then, as a result, questioned the district court's

4    injunction, and ultimately set aside the agency action and

10:10AM  5    remanded rather than vacated the permanent injunction issued by

6    the district court.

7         So my question to you is:  Is that a good law, in your

8    view?  And even if your legal arguments have merit, would this

9    Court err by entering a permanent injunction under that

10:10AM 10   rationale?

11        MR. WATSON:  It's a great question; and there are four

12   points I'll try to hit very briefly in response to that, all of

13   which I think are important.

14        The first is that vacatur -- which is, as you know, what

10:10AM 15   the DC Circuit did, it vacated the rule in its entirety -- that

16   is certainty an appropriate remedy, and it is one of the

17   remedies that we are seeking here.  And the Fifth Circuit would

18   agree.  The *Chamber of Commerce* case at page 388 from the Fifth

19   Circuit is an example of a situation where the definition of

10:11AM 20   fiduciary was invalid there, and the court vacated the rule.

21   So vacatur is an appropriate remedy, and we are seeking it.

22        Secondly, the government's arguments about the alleged

23   inappropriateness of a nationwide injunction here are really

24   focusing on the propriety of extending the injunction to

10:11AM 25   non-parties.  That's really the objection that they make.  And

1    I would note that it's inconsistent for the government to now

2    claim that it would be improper for this Court to grant relief

3    that runs to non-parties, when the government's previously

4    asked the Court for a stay at the effective date the first time

10:11AM  5    around, and that stay extended to non-parties.

6        The third point I would make is that the Fifth Circuit

7    has made clear that nationwide injunctions are permissible and

8    may even be required in APA cases.  The *Texas versus United*

9    *States* case from the Fifth Circuit in 2015, at page 188, in

10:12AM 10    footnote 211, discusses why an injunction that extends

11    nationwide, i.e., to non-parties, was appropriate there and was

12    consistent with the extensive judicial power.

13        And the fourth point I would make is that a nationwide

14    injunction, when nationwide relief is needed in order to give

10:12AM 15    complete relief to the retailer plaintiffs who sell cigarettes

16    manufactured not only by the plaintiffs here but by at least

17    one manufacturer that is not a plaintiff here, and, thus, to

18    give them full relief, the injunction should extend to all

19    parties, not just the parties to this particular case.

10:12AM 20        So those are -- I'm happy to answer any other follow-up

21    questions, but those are my initial responses to your question.

22        THE COURT:  One follow-up question is:  What's your best

23    argument against the government's suggestion, I think, in their

24    reply, that even if vacatur and remand were the correct remedy

10:13AM 25    under the APA, that the severability provision of the Tobacco

1    Control Act, which is also a Congressional enactment, is more

2    specific and therefore controls and would require only severing

3    certain provisions of either the act or the rule, rather than

4    vacating and remanding altogether?

10:13AM 5         MR. WATSON:  That's a very interesting issue, and I

6    think there are three points I'd make in response to that.

7         The first is that, in our view, the rule is invalid in

8    its totality; and, thus, it needs to be invalidated in its

9    entirety.  Most of our arguments, if accepted, would invalidate

10:14AM 10   the entire rule.

11        For example, the notion that the warnings are unduly

12   burdensome, or that the informational interest is insufficient,

13   or our APA arguments, and there are others.  So a number of

14   them would just invalidate the rule entirely.

10:14AM 15        Secondly, even if the images were legally problematic,

16   the textural statements can't be severed from the images

17   because the TCA expressly and specifically provides that the

18   text must, quote, accompany the images.  And that is a more

19   specific command that addresses the very particular issue here,

10:14AM 20   the general severability provision that exists in the TCA.  So,

21   in other words, it's a specific that governs the general

22   situation.  And the TCA commands the graphics that accompany

23   the textual statements is more specific because it speaks to

24   severability in this particular context.

10:14AM 25        The *Miller versus Albright* case from the Supreme Court

1    has an interesting discussion in a Justice Scalia concurrence

2    about specific governs the general in a severability context,

3    so that is something I would cite the Court to.

4         THE COURT:  That concludes my questions initially for

10:15AM  5    plaintiffs.

6         For the benefit of court personnel, I'm going to take a

7    brief, say, seven-minute recess, and then we will resume with

8    hearing argument from Mr. Baer for the defendants.  So please

9    stay on the line.  We will not close out the line.  I will

10:15AM 10    simply mute my line, and come back on at 10:22 Central Time.

11         [PROCEEDINGS IN RECESS]

12         THE COURT:  The Court will now resume the hearing from

13    our recess.

14         Before we get started, let me again cover a few

10:22AM 15    preliminaries.

16         Mr. Baer, you mentioned you will be presenting argument

17    for defendants.

18         So at this juncture let me pause and ask the court

19    reporter and you, to ensure that you can be heard.

10:23AM 20         Mr. Baer, are you on the line, and would you please make

21    yourself known?

22         MR. BAER:  Thank you, Your Honor.  I am on the line.

23    This is Michael Baer from the Department of Justice on behalf

24    of the defendant.

10:23AM 25         THE COURT:  And may I ask that the court reporter

```
 1    continues to be able to hear Mr. Baer?

 2         [STENOGRAPHIC COURT REPORTER CLARIFICATION]

 3         THE COURT:  Very good.

 4         Is everyone ready to proceed with the hearing?

 5         Mr. Watson?

 6         MR. WATSON:  Yes.  I'm ready to proceed.  Thank you,

 7    Your Honor.

 8         THE COURT:  Mr. Baer?

 9         MR. BAER:  Yes, Your Honor.

10         THE COURT:  Okay.

11         Mr. Baer, I do intend to let you make your most

12    synthesized version of the argument as well; but before I do,

13    let me preview a question that may require some attention from

14    one of your cocounsel, in case they wish to work on that while

15    you're presenting argument.  That question is for defendants to

16    please provide specific citations to the joint appendix for all

17    of defendant's support on the past deceptions point.  That is,

18    the support for defendant's assertion of past deceptions by the

19    tobacco industry and when they were and how this rule may be

20    intended to affect them.

21         I don't anticipate you would have that your fingers, but

22    I would intend you to answer that question at some point in

23    your argument, and wanted to preview it in case one of your

24    cocounsel would care to be doing any work on that while you

25    present argument.
```

1         So, with that, let me turn it over to you and ask you to

2    make your opening or summary of argument.

3         MR. BAER:  Thank you very much, Your Honor.  Again, this

4    is Michael Baer for the Department of Justice on behalf of the

10:25AM 5    defendants.

6         Your Honor, if I may, I'd sort of like to step back and

7    set the scene a little bit as to both why the cigarette health

8    warnings at issue here are necessary and how they came about,

9    because they did not just arise overnight.  They were the

10:25AM 10   result of decades of congressional and regulatory attention to

11   the lack of public knowledge of the dangers and risks of

12   smoking cigarettes, and they were the product of a particularly

13   extensive, exhaustive effort on the part of the Food and Drug

14   Administration to investigate both the science surrounding the

10:25AM 15   health conditions addressed in the warnings as well as the

16   communication science around how to effectively ensure that

17   members of the public understand the risks of what are,

18   arguably, the most dangerous consumer product widely available.

19        So, Your Honor, that sort of congressional and

10:26AM 20   regulatory journey began in 1965, when Congress passed what is

21   known as the Labeling Act, and that was the first time that the

22   surgeon general's warnings were required on cigarette packages.

23   And from the outset, the policy and purpose of that act was to

24   establish a system of warnings through which the public may be

10:26AM 25   adequately informed about any adverse health affects of

 1    cigarette smoking.  So, in other words, from the statutory

 2    language early on, from the get-go, ensuring that the public

 3    understands adverse health affects of smoking was a key part of

 4    this regulatory architecture.  And that's continued over the

 5    years as Congress has returned to the question of how best to

 6    inform members of the public about those risks.

 7         And so the warnings, the content of the warning gets

 8    changed through legislation in 1969.  And then, again, in 1984,

 9    Congress expands the warnings that are required and establishes

10    the four surgeon general's warning that we have today.

11         Then, of course, as relevant here, in 2009, through the

12    passage of the Tobacco Control Act, Congress required larger

13    warnings, with pictorial contents, that are the source of the

14    authority that FDA implemented when it issued the rule that's

15    at issue today.  That rule features 11 health warnings that

16    describe and depict some of the lesser known consequences of

17    smoking.

18         And, Your Honor, here may be a good point to address one

19    of the questions that Your Honor flagged at the outset.  I,

20    candidly, have not received further information yet from my

21    cocounsels.  But in anticipation of the question of past

22    deception on the part of the tobacco industry, I did just want

23    to note that at least one piece of evidence that we cite is, of

24    course, findings from past court causes on this issue, and I

25    invite the Court to consider the *United States versus Philip*

1    *Morris* court decision at 449 F.Supp.2d 1, and so the citation

2    is going to be from page 855.  And, there, in terms of

3    characterizing efforts of deception, the Court there noted

4    that, quote:  Those efforts were, quote, demonstrated by not

10:28AM  5    only decades of press releases, reports, booklets, newsletters,

6    television and radio appearances, and scientific symposia and

7    publications, but also by evidence of their concerted efforts

8    to attack and undermine the studies of mainstream scientific

9    publications, such as the Reports of the Surgeon General.

10:28AM 10        In other words, for decades, the tobacco industry had

11   launched a concerted campaign to call into question the linkage

12   between the health affects, the negative health consequences of

13   smoking, and the consumption, obviously, of cigarettes.

14        I was, frankly, a little bit startled to hear some of

10:29AM 15   the same echoes of those messages come through in Mr. Watson's

16   presentation, questioning the accuracy of the causal statements

17   just in the text warnings that are at issue here, and again,

18   calling into question more broadly a track record of deception.

19   But, Your Honor, for purposes of today's case and today's

10:29AM 20   hearing, I don't think the Court needs to wade into the waters

21   of the industry's history of deception to hold that these

22   warnings are fairly constitutional.

23        And so turning to the First Amendment analysis here, as

24   we note in our briefs, the appropriate standard to apply to

10:29AM 25   assess the constitutionality of these pictorial health warnings

 1    are the standards set out in the Supreme Court's *Zauderer* case.

 2         Now, the reason that *Zauderer* applies -- plaintiff's

 3    phrased it as a threshold requirement, and, frankly, I don't

 4    think it matters much for purposes of this discussion whether

 5    it's a threshold requirement or just a requirement that is a

 6    part of the *Zauderer* inquiry -- but the threshold requirement

 7    there is that the disclosures at issue be purely factual and

 8    uncontroversial information.

 9         But before we even get to that requirement, plaintiffs,

10    of course, have suggested that the whole concept of the

11    *Zauderer* case law is inapplicable here, given the nature of the

12    government's interest, and so I'd like to start there.  Because

13    as I understood plaintiff's argument and as I read their

14    briefs, they have not disputed that every single court of

15    appeals that has considered the issue has come down unanimously

16    in favor of the proposition that the interest described in

17    *Zauderer* -- sorry -- the interest that regulations evaluated

18    under *Zauderer* are designed to address are not limited to

19    preventing consumer information, consumer misinformation, or

20    consumer deception, and it's certainly not so limited as to

21    remedying consumer deception in the same advertisement or form

22    of commercial speech to which the disclosure requirement is

23    appended.

24         THE COURT:  Now, Mr. Baer, you mentioned the circuit

25    courts.  Has the US Supreme Court ever applied *Zauderer* to

1   compel disclosure requirements that were not designed to

2   correct misleading commercial speech?

3      MR. BAER:  So, Your Honor, I don't believe the Court has

4   ever, at least, expressly stated that it has applied *Zauderer*

10:31AM 5   to uphold a commercial speech disclosure requirement in those

6   circumstances.  But I would note that in *NIFLA*, for example,

7   the Court was very clear in distinguishing the facts of that

8   case, which, at least with respect to the one of two notices at

9   issue there, it said *Zauderer* was not the appropriate lens in

10:32AM 10   which to view it.  The court was clear that it was not

11   questioning longstanding health and safety warnings; and, for

12   one of the mill commercial disclosures, long considered to be

13   legal.  And so, there, I think the court was drawing a contrast

14   between the type of disclosure requirement that was at issue

10:32AM 15   for licensed clinics in *NIFLA* with other types of disclosures

16   of sort of purely uncontroversial factual commercial

17   information that occur sort of throughout society, and I don't

18   think that distinction or that contrast makes sense unless the

19   court was recognizing that *Zauderer* would apply in accepting

10:32AM 20   the legality of those longstanding long-required disclosure

21   requirements.

22      THE COURT:  What do I do with the purely factual and

23   uncontroversial requirement, given that plaintiffs, at least,

24   maintain that even some of the textual warnings themselves are

10:33AM 25   controversial by suggesting causation significance that does

1    not exist?

2         MR. BAER:  I'm sorry, Your Honor, I'm quite sure I

3    caught the question there.

4         THE COURT:  Let me rephrase it then.  In your

10:33AM  5    opposition, I believe this is at PDF page 33, you state that

6    the plaintiffs do not disagree that the textual warnings

7    required by the agency rule are uncontroversial.  I posed that

8    question to plaintiffs a moment ago, and they quite vigorously

9    argued that some of the warnings were factually controversial.

10:33AM 10    Could you justify your assertion that there's dispute on the

11    controversiality of those statements?

12         MR. BAER:  So, certainly, if plaintiffs are disputing

13    it, then they are, of course, creating the dispute.

14         In terms of justifying the statement at the time we made

10:34AM 15    it in our opening brief, that was certainly our best reading of

16    their initial summary judgment filing here.  Which, as we read

17    it, focused the criticism of the factual controversial nature

18    of the warnings on the images and the suggestion that those

19    images created to -- led to exaggerated impression of the

10:34AM 20    negative health consequences of smoking.

21         I would say, though, it wasn't entirely clear from

22    Mr. Watson's argument, but I still don't take the plaintiffs to

23    be questioning the factualness of the statement at issue in the

24    warnings.  In order words, although they may suggest that there

10:34AM 25    are misleading impressions that could come from those

1   statements -- and we can turn in a moment to why I think that

2   argument isn't well supported -- I hope that they are not

3   questioning that cigarette smoking causes all of the health

4   conditions identified in the warnings because that -- such a

10:35AM 5   sort of contention would run afoul of the scientific consensus

6   that is reflected in the 2014 surgeon general's report.

7        But I'm not aware of, more broadly, scientific evidence

8   that calls into question the accuracy of those statements.  So

9   I sort of hope that that, at least, can be kind of beyond the

10:35AM 10   realm of questioning for purposes of this argument.

11        THE COURT:  Do you disagree, and why, with then-Judge

12   Kavanaugh's statement and concurrence in the *AMI* case that

13   governmental interest in promoting awareness is insufficient,

14   legally, to establish a substantial interest because it's

10:35AM 15   essentially circular and so vague that it would undermine that

16   requirement altogether?

17        MR. BAER:  Your Honor, I don't think Judge Kavanaugh --

18   or then-Judge Kavanaugh's, excuse me -- concurrence in *AMI* to

19   be stating quite so categorical a proposition.  Rather, I think

10:36AM 20   it's consistent with the holding of the Second Circuit in the

21   *International Dairy Foods Association* case, which is to say

22   that of course the government can't justify the disclosure

23   requirement for the sake of consumer curiosity or information

24   for information sake, divorced from any significance or

10:36AM 25   importance attached to that information.  And one of the pieces

1   of then-Judge Cavanaugh's reasoning that is consistent with

2   that fact is sort of pointing to historical precedence as a

3   basis for findings that there is legitimacy to an interest --

4   so pointing to decades of congressional actions or findings on

10:36AM  5   a particular issue -- is a way of being able to sort of

6   separate the wheat from the chaff and to say, okay, yes, the

7   government does have an interest in ensuring that this kind of

8   knowledge or information is out there, versus this is just sort

9   of feeding the consumer curiosity.  So, here, I would contrast

10:37AM  10   the record of, again, decades of congressional attention to the

11   importance of individuals having information about the negative

12   health consequences of smoking with the information that was at

13   issue in the Second Circuit case where there was a disclosure

14   requirement about whether cows were treated with hormones,

10:37AM  15   where the court went out of its way to emphasize that there

16   wasn't any suggestion that that information was somehow salient

17   or important for matters of public health.

18       And so absent that connection to a consumer could use

19   this information in a way that would actually affect that

10:37AM  20   consumer's health or wellbeing, you know, there isn't a

21   sufficient justification for the disclosure requirement.

22       THE COURT:  I'm sorry to interrupt you.

23       Just to articulate that in my own words, your limiting

24   principle is that an interest in promoting consumer awareness

10:38AM  25   is sufficient if that interest stems from or is related to

1   public health or sort of a common sense prediction that

2   consumers would want to know this information before deciding

3   whether to purchase or use a product?

4       MR. BAER:  So I think those would certainly be a way of

10:38AM 5   phrasing it or framing it.  I don't even know that you need to

6   get to the point of sort of predicting what consumers want if

7   there was something -- because, again, I think the

8   consumer-want test both gets a little bit in the consumer

9   curiosity problem but also potentially ignores in which the

10:39AM 10  government makes a considered judgment that there is a

11  certain -- there's certain information that whether it's for

12  the sake of public health or for the sake of the functioning of

13  democracy, as in the *Citizens United* example that we cited and

14  that plaintiffs actually cite in their own brief.  There are

10:39AM 15  certain categories of information that I think is reasonable

16  for the government to attach salient or significant to, and to

17  say that we think it's important that an informed public have

18  access to that information to make important choices.

19      THE COURT:  Sort of, what percentage of the public would

10:39AM 20  want to know information before there can be a substantial

21  interest in compelling manufactures to disclose that

22  information?  Do you have any thoughts on that in the abstract

23  or with specific examples?

24      MR. BAER:  So again, Your Honor, sort of consistent with

10:39AM 25  my last answer, I think I would at least somewhat push back on

1  the notion that we should think of it in terms of what

2  percentage of the public wants to know the information.  And I

3  think the evidence for pushing back on that suggestion comes

4  from sort of the foundational Supreme Court cases that we cite

10:40AM  5  that deal with informational interests.  You know, in the

6  *Citizens United* case, I don't take the court to be

7  interrogating when, in a holding, the disclaimer and the

8  disclosure requirements that were at issue there -- I don't

9  take the Court to be interrogating how much of the public would

10:40AM 10  want to know information about, for instance, the financing of

11  certain election related communications.  Rather, the court was

12  making a sort of more objective principled characterization or

13  argument that it's important for the public in a democracy to

14  have information about who is financing that type of speech

10:40AM 15  because that allows the public to participate more effectively

16  in the democracy and to be more informed and to make informed

17  choices,, and so I think there is room for the government to

18  make those sorts of value-based judgments.

19       I do think, here, just to return to an earlier framing

10:41AM 20  that Your Honor let out, there is sort of just common sense

21  indicates that whether you're going under the knife for surgery

22  or whether you're making a run-of-the-mill purchase at a

23  convenience store, it's important to be able to know that

24  something may give you bladder cancer, something may cause

10:41AM 25  blindness, that something may cause harm to your children.

1    These are all kind of basic pieces of information about, in

2    this case, a product millions of Americans put into their body,

3    that I think common sense dictates the government has

4    substantial interest in ensuring that individuals are aware of.

10:41AM 5        THE COURT:  Right.  And the *Zauderer* test requires

6    courts to decide if there is a substantial interest.  Even

7    *Central Hudson* looks at the substantiality of the interest.

8    And so I'm a struggling with trying to understand how that

9    applies.  Courts have recognized that that's something of an

10:42AM 10   open-ended test.  If it is a test, it has to screen out some

11   things, one would assume.

12       So can you give me an example of an interest that would

13   be screened out by that test, if not a substantial government

14   interest?

10:42AM 15       MR. BAER:  Absolutely, Your Honor.  And apologies for

16   returning to a case we've already discussed.  I think the

17   consumer curiosity example is probably the clearest one here.

18   That, even if there is public demand for a certain kind of

19   information -- and I think, in the context of the Second

10:42AM 20   Circuit *International Dairy Foods Association* case, there was

21   interest in knowing whether cows were treated with growth

22   hormones.  That consumer interest alone isn't sufficient

23   because it's not linked to any sort of decision of significance

24   for individuals.  There wasn't a way in which it affected --

10:43AM 25   had the potential to affect their health or wellbeing in a

1    meaningful way.

2         THE COURT:  What about information that, if consumers

3    learned it later, it might cause them stress?  One of the

4    warnings here is about stunting fetal growth.  Another thing

10:43AM  5    that I believe is shown to stunt fetal growth is stress, stress

6    to the mother.  So can the government require disclosure of

7    information that if learned might create stress, so that

8    mothers can avoid buying products that might later cause that

9    stress?

10:44AM 10         MR. BAER:  So, Your Honor, just as kind of an initial

11   housekeeping point, I think sort of, analytically, we may be

12   getting out of the realm of what interests are -- can

13   constitute substantial interest and getting into the realm of

14   then once there is an interest the disclosure at issue, you

10:44AM 15   know, is reasonably related or not, unjustified and unduly

16   burdensome to that interest.

17         And I say that only because I think, to Your Honor's

18   question, of course the government has a substantial interest

19   in informing women about the risks to their babies that may

10:44AM 20   come from consuming a particular product, that sort of a

21   foundational informational interest.  And then, if there were

22   to be an argument that the benefits of giving that information

23   aren't worth it in a particular case, I think that would get to

24   the sort of more substantive application of the other part of

10:45AM 25   the *Zauderer* inquiry.  And I'm happy to talk about why I think

 1   that would easily be satisfied here.  Although, I don't

 2   understand plaintiffs to have sort of made that trade-off

 3   argument in this case.

 4         THE COURT:  So you think it could be constitutional

10:45AM  5   under the First Amendment for the government to compel

 6   manufactures of other products to occupy half of their front

 7   label with the same picture that is in the agency rule here and

 8   with the warning that this product may cause stress that stunts

 9   fetal growth?

10:45AM 10         MR. BAER:  So I think, in the context of other

11   products --

12         THE COURT:  It could be social media usage invites

13   stress that may cause fetal growth, so now some social media

14   platform has to display this graphic.  Would that qualify as a

10:46AM 15   substantial interest?

16         MR. BAER:  So, again, I do want to sort of separate the

17   question of the substantiality of the interest from then the

18   application of the rest of the *Zauderer* inquiry.  So a

19   substantial interest in informing individuals about the risks

10:46AM 20   to their health or to the health of their fetus from certain

21   products or services, without knowing kind of the specifics,

22   it's a little hard to weigh in.  But I think, at least in the

23   abstract, of course, there could well be a governmental

24   substantial interest in providing that fundamental health and

10:46AM 25   safety information.

1    But to the question of whether or not -- to the other

2    part of Your Honor's question, that means the government can

3    sort of automatically require large warnings that take up

4    50 percent of a product's packaging, I think there are a number

10:46AM 5    of steps that you would have to clear before you would even

6    ask or that question would even be presented, and then perhaps

7    even more before the question would be resolved in favor of the

8    government.

9    And, in particular, I think what separates cigarettes

10:47AM 10   from a number of other products where we might imagine that

11   there are health risks are, first, again, the decades of

12   congressional attention to the problem.  Related to that, the

13   efforts that Congress has made to tweak and refine its warning

14   system over time.  The findings that those tweaks and efforts

10:47AM 15   haven't been sufficiently effective.  And then, finally, a

16   year's long record full of robust research about the degree to

17   which both there is not sufficient information about the health

18   risks that these warnings address and also evidence of the

19   extent to which these warnings promote understanding of those

10:47AM 20   specific health risks.  And I recognize all of that is a bit of

21   a mouthful, Your Honor.  But the point of emphasizing all of

22   those steps in the process is you only get to the kinds of

23   warnings you have here after those kinds of steps or steps of

24   those sorts of magnitude.

10:48AM 25   And I think, then, it shouldn't be surprising that the

1    only warnings that we've seen of this nature are for the most

2    dangerous widely available consumer products in the country.

3         THE COURT:  So, here, you would screen out some of those

4    hypotheticals not so much at the substantial interest stage but

10:48AM  5    at the unduly burdensome stage, based on the anticipated facts

6    of those hypotheticals?

7         MR. BAER:  Exactly, Your Honor.

8         As I read *Zauderer*, the sort of unjustified and unduly

9    burdensome part of the inquiry, the sort of the flip side of

10:48AM  10   the reasonably related part of the inquiry, and it's at those

11   stages that you would screen out some of those hypotheticals.

12   Because I think there would need to be a record akin to what we

13   have here, and I mean that both in the terms of the scientific

14   administrative record but also in terms of, again, kind of the

10:49AM  15   congressional regulatory record that bolters the

16   appropriateness of requiring these kinds of disclosures on

17   these specific products.

18        THE COURT:  Would the burdensomeness test screen out

19   graphic warnings if the stakes were not to help a consumer but

10:49AM  20   also the quite severe stakes of whether a product was made with

21   slave labor in other countries?

22        This is just by way of a hypothetical to help limit your

23   argument.  But what about a hypothetical mandate for certain

24   products, whether it be a chocolate bar or a piece of

10:50AM  25   technology, to bear on their label some graphic warning that in

1    the government's view they were made with slave labor or some

2    other sort of abhorrent legal practices in other countries?

3           MR. BAER:  A couple of thoughts and reactions to that,

4    Your Honor.

10:50AM 5           First, although we've been talking about sort of the

6    substantiality of the interest in sort of a purely

7    informational sense, that, of course, doesn't preclude the

8    government from asserting an interest under *Zauderer* in

9    ultimately affecting consumer behavior.

10:50AM 10           And so, for instance, in then-Judge Cavanaugh's analysis

11    in AMI, he ultimately agreed with the results there because of

12    the finding about the disclosures of the country of origin of

13    meat products would promote consumer behavior to buy American

14    meat.  And I say all of that, just by way of Your Honor's

10:50AM 15    hypothetical, one could imagine a spectacular analysis applying

16    to products made with slave labor, you know, that the

17    government has an interest in affecting consumer decisions

18    about that.

19           Although, the caveat I would give in that instance is,

10:51AM 20    depending on how such a disclosure requirement were

21    characterized, you might run into the kind of a problem that

22    you had in the *Entertainment Association* case out of the

23    Seventh Circuit or the *National Association of Manufacturers*

24    case from the DC Circuit, where, in the Seventh Circuit case,

10:51AM 25    you had a warning label with the number 18 on it, and that was

1  to be appended to sexually explicit material, and where in the

2  *National Association of Manufactures* case from DC you had the

3  conflict-free certification that needed to be disclosed, and in

4  both cases the court found that those were essentially sort of

10:51AM  5  value judgments, subjective judgments, that didn't qualify as

6  purely factual and uncontroversial.

7      And I just note all of that by way of saying you would,

8  of course, have to interrogate whether products made with the

9  slave labor determination was factual and uncontroversial, as

10:52AM  10  opposed to something that was the subject of significant and

11  bona fide disputes.

12      THE COURT:  What is your response to the plaintiff's

13  argument, which echoes the panel majority in the 2012 RJ

14  Reynold's decision, that the graphics are sufficiently

10:52AM  15  open-ended, that they require interpretation by the viewer, and

16  that that open-endedness and that need for interpretation

17  renders them sufficiently either non-factual or at least

18  sufficiently controversial that it does not meet that *Zauderer*

19  framework element?

10:52AM  20      MR. BAER:  So I disagree with that, the plaintiff's

21  characterization, Your Honor.  And I disagree with it for

22  several reasons.

23      The first is that, as we note in our brief, that sort of

24  seems to be an argument against using all images, whatsoever,

10:53AM  25  in warnings.  And so, for instance, you could imagine even just

1    an abstract image, a symbol, like an exclamation point in a

2    triangle -- which we often understand to mean warning, but

3    individuals could have varied reactions or responses to -- but

4    that somehow wouldn't prompt to purely factual and

10:53AM  5    uncontroversial information.

6        Similarly, we note any existing cigarette warnings --

7        THE COURT:  But no one thinks an exclamation point in a

8    triangle is a grammar teacher instructing people on proper

9    punctuation.  Whereas, at least, arguably, here, some of the

10:53AM  10   pictures do require interpretation.

11       What do you make of a person, with their chest exposed

12   and stitches going down it -- there's degrees of causation that

13   may be controversial; correct?

14       MR. BAER:  So, Your Honor, I maybe want to separate out

10:54AM  15   that last part of your question from what I understood to be

16   the preceding piece, which I understood the preceding piece to

17   be getting at the question of how much sort of interpretive

18   leeway is there for which kinds of images, and aren't the

19   images here sort of more prone to multiple interpretations.

10:54AM  20   And I'd say a couple of things on that first point.

21       Which is, first, that right now we're talking about

22   these images, but as a general rule I don't think it makes

23   sense to think about the images as divorced from the text.

24   That, of course, these warnings are appearing as text image

10:54AM  25   pairs.  And so even if in the abstract an image might be

1   subject to different or multiple interpretations, I think when

2   paired with clear textual warnings, as they are here, there's

3   much less concern about the sort of image clarity.  And I think

4   when compared --

10:55AM 5        THE COURT:  Regarding that point, what role does the

6   language counterpoint have?  One argument is there's a

7   substantial portion of this country -- not a majority -- but a

8   substantial portion that has limited English proficiency.  Does

9   that undermine the argument that image and text have to be

10:55AM 10  considered as a pair if the text cannot itself be comprehended

11  by some substantial part of the country?

12       MR. BAER:  So, respectively, Your Honor, I don't think

13  it does.  Because I would just note that for that category of

14  individuals, if you have only a text only warning, then they're

10:55AM 15  getting absolutely no information and could view a text only

16  warning as almost, literally, an infinite number of

17  possibilities.  The image at least sort of narrows the focus

18  and the realm of possibilities, and it particularly does so in

19  the context of being appended to the cigarette advertisements

10:56AM 20  or warnings.

21       In other words, to use Your Honor's example from a few

22  moments ago of the warnings image that accompanies the textual

23  warning about heart disease and strokes that can be caused by

24  blocking arteries -- which cigarette smoking causes -- putting

10:56AM 25  an image of a man with the sort of surgery marks on his chest

1    that appears in that image on a cigarette package, I think,

2    naturally leads to the linkage between cigarette smoking and

3    that consequence.  And even if one doesn't purposely understand

4    sort of all of the detail in the text because one doesn't speak

10:56AM 5    English -- although, I would, just as a brief aside, Your

6    Honor, note that there are also Spanish language versions of

7    these warnings that FDA prepared and at are issue here -- that

8    that information, again, it's still accurate and within a much

9    narrower realm of bounds of what a viewer of that warning might

10:57AM 10   think it's about than a text warning that are they're wholly

11   incapable of reading.

12        THE COURT:  Let me also circle back little bit to the

13   abstractness of the governmental interest asserted here.  Is

14   the FDA, are the defendants, in any way distancing themselves

10:57AM 15   from an asserted governmental justifying interest of either

16   reducing or at least maintaining from increase of prevalence of

17   smoking?

18        MR. BAER:  The government is not defending this rule on

19   that basis.  Which, just to be clear, is a separate statement

10:57AM 20   from whether the government as a whole or FDA as a whole is

21   distancing itself from that interest in other rule makings or

22   other agency actions, because I think that the agency's record

23   speaks for itself there.

24        THE COURT:  So help me understand, why are the

10:58AM 25   defendants adopting that limit?  The asserted governmental

1    interest in this rule of promoting consumer awareness is not

2    just so the consumers can sort of appreciate the beauty of

3    knowledge; right?  It's so the consumers can act on that

4    knowledge; correct?

10:58AM  5         MR. BAER:  Yes.  So that consumers have information to

6    be able to make more informed choices; and, obviously, one of

7    those choices may well be to stop smoking.  But the

8    government -- or to not take up smoking to begin with.  But the

9    government is not justifying these warnings on the basis of a

10:58AM 10   sort of an empirical prediction of how that will play out.

11         Your Honor, I thought the colloquy you had with

12   Mr. Watson earlier about the consumer deception cases and

13   interest was sort of on point to this line of inquiry, where in

14   other contexts where we think about information being important

10:59AM 15   to consumer choice there isn't then a subsequent interrogation

16   of whether having corrected for deception or having prevented

17   deception, consumers, in fact, make different choices.  There's

18   no part of *Zauderer* that deals with, well, how many customers

19   are going to be dissuaded from retaining the services of the

10:59AM 20   attorney who is advertising contingency fee based

21   representation, or, in *Milavetz*, no finding about how many

22   fewer customers' debt release that people have that they have

23   to disclose that the prospect of using their services could

24   include filing for bankruptcy.  There's just -- I think that's

10:59AM 25   sort of acknowledged then in the case law and again here in

1   sort of the legislative history, specific to cigarette health

2   warnings, that this is information that's important to consumer

3   choice.

4        And the most recent iteration of that, of course, comes

11:00AM 5   from the Tobacco Control Act itself, which as Your Honor

6   mentioned earlier with Mr. Watson, in Section 202(b) of the

7   Tobacco Control Act, Congress singled out the interest in

8   promoting greater public understanding of the risks of

9   cigarette smoking as an interest that is sort of the touchstone

11:00AM 10  for making any changes to the warnings here.

11        THE COURT:  Right.  I think it's hard to deny that

12  that's the interest, because it's asserted in the statute, is

13  promoting greater public understanding of the risk associated

14  with the use of tobacco products, at Section 202(b); or,

11:00AM 15  Section 201(a), depicting the negative health consequences of

16  smoking.

17        I guess my question, though, is why does the government

18  resist -- what seems to be a common-sense proposition -- that

19  the reason for promoting that greater public understanding is

11:01AM 20  to reduce or at least maintain without increase a rate of

21  smoking?  If you're trying to educate people about the downside

22  of something, when, in theory, the reason you're doing that is,

23  again, not just the beauty of knowledge, this is not promoting

24  awareness of other religions so we can appreciate them and live

11:01AM 25  in harmony more, it's because the government wants to decrease

1    or at least not increase the prevalence of smoking; correct?

2         MR. BAER:  So, again, Your Honor, I don't deny that in

3    other regulatory actions the FDA has undertaken there is this

4    focus in having that affect.  And it certainly is a plausible

11:02AM 5    characterization of what may happen in the future, that fewer

6    individuals will smoke once they're better informed of the

7    negative health consequences of smoking.

8         But to the specific question of whether that is the

9    reason why there is value in the informational interest, I

11:02AM 10   actually don't think that's right.  I think that, here, the

11   government -- here, FDA -- would think it important to provide

12   this information even if it did not change the number of

13   individuals who smoked, much in the same way that the

14   government might require fully informed consent and therefore

11:02AM 15   disclosure of certain health risks for surgery.

16        THE COURT:  Two points.  First of all, I'm not

17   suggesting that it would have to change the number of people

18   who smoke.  This information, the government could want to get

19   it out there just so that the number of people who smoke

11:02AM 20   doesn't increase, and that would still be smoking prevention in

21   the sense of preventing it from increasing from where it would

22   be without the warnings; correct?

23        MR. BAER:  Yes.  As I understand the question, yes.

24        THE COURT:  Secondly, I understand your legal point

11:03AM 25   about this doesn't have to be the touchstone for assessing

1    either the First Amendment fit or the arbitrary and

2    capriciousness under the APA, but I guess I still don't

3    understand how -- are you denying -- the title of the act is

4    the Family Smoking Prevention and Tobacco Control Act.  Doesn't

11:03AM 5    the title of the act itself say that one of Congress's purposes

6    in mandating these warnings was to prevent smoking?  Isn't it

7    called the Family Smoking Prevention and Tobacco Control Act?

8    Isn't that the title of the act?

9         MR. BAER:  That is, of course, the title of the act,

11:03AM 10   Your Honor.  And there's no doubt that, in thinking of the

11   statute as a whole, that was indeed of one of Congress's

12   purposes.

13        THE COURT:  Okay.  Again, I understand you are making

14   new arguments about that doesn't have to be the touchstone for

11:04AM 15   assessing the validity, the free speech validity or the APA

16   validity.  You're not denying that the reason that Congress

17   wanted these warnings was to prevent smoking; right?

18        MR. BAER:  So, Your Honor, on that particular point, I

19   actually don't know that we can say that that was the reason

11:04AM 20   that Congress wanted these particular warnings, especially when

21   you consider that the language Congress used in Section 202(b)

22   goes to promoting greater public understanding.

23        Now, Congress -- I don't deny that Congress may have

24   thought or hoped that one consequence of promoting greater

11:04AM 25   understanding would be to either hold constant or decrease

1    smoking rates, but I don't know that we sort of know specific

2    to this provision what Congress is thinking on that point.

3            And just to sort of emphasize or to sort of drive that

4    point home a little bit, Mr. Watson earlier was talking about

11:05AM  5    the DC's Circuit recent decision in the *Cigar Association* case

6    where, there, the DC Circuit was considering a separate

7    provision of the Tobacco Control Act that did require for

8    certain regulatory undertakings -- and, to be clear, those

9    regulatory undertakings are different from the warning

11:05AM 10    requirements that are at issue here -- but for this other

11    category of regularity undertakings under the TCA, Congress did

12    include a requirement that there be a finding as to the affect

13    of the regulation on smoking rates.  So Congress was attuned to

14    that issue and chose to require that sort of consideration or

11:05AM 15    finding in some aspect of the TCA but not others, and it didn't

16    choose to require that kind of finding or undertaking here.

17            THE COURT:  And then, related to the graphical part of

18    the warnings here, defendants are also not seriously denying,

19    right, that the graphics were selected, in part, because they

11:06AM 20    are stark and captivating; correct?

21            MR. BAER:  I don't deny that they were selected, in

22    part, to ensure noticeability.  I think stark and captivating

23    gets a little closer to some of the considerations that the

24    government I think very consciously was striving to avoid in

11:06AM 25    crafting these images.  But, certainly, the record is clear

1    that a key aspect of the understanding is noticing the warning

2    and attending to it, and so these warnings were, indeed,

3    designed to further that interest.

4          THE COURT:  There's no particular magic to those words I

5    selected.  But the whole idea, right, was that having the

6    graphic images -- which some describe as grotesque -- were

7    designed to captivate consumer attention or potential consumer

8    attention, and make the information on the FDA's argument more

9    readily communicated and it would take; right?  That was the

10   whole idea, was it would increase the informational value?

11         MR. BAER:  Yes.  That it would increase the

12   informational value by getting consumers to notice and attend

13   to the warnings.  And as Your Honor, I think, put it well,

14   ensure that it improved the communicative function or ability

15   for individuals to sort of digest and retain that information.

16         THE COURT:  And so one of the questions I have to ask,

17   under the *Zauderer* framework the government's arguing should

18   apply, is whether the compelled disclosure is unduly

19   burdensome.  And there will always be -- at least, up to

20   certain limits, there will always be an argument that even

21   larger and bolder and more captivating graphics would better

22   capture consumer attention and better communicate a message.

23   So what is the line at which the increased effective

24   communication rationale runs out and compelled disclosure does

25   become too effective?  Is it 75 percent of the packaging of

1   cigarettes?  Would that be unduly burdensome?

2        MR. BAER:  So, Your Honor, I think picking a percentage

3   as to where that line exits is, I think, sort of a difficult

4   undertaking, and, frankly, one that I think may not be

11:08AM 5   necessary here, given what the record found in terms of

6   warnings of the size -- or given what FDA found based on the

7   record in terms of how warnings size correlate to

8   effectiveness.

9        And, here, the FDA made express findings -- that I don't

11:09AM 10   understand to have been controverted by plaintiffs at any point

11   in their briefing -- and this is at pages 15,650 to 51 of the

12   final rule, which is at 85 Fed Reg, quote:  The scientific

13   literature strongly supports that larger warnings, such as

14   those of the size proposed in this rule, are necessary to

11:09AM 15   ensure that consumers notice, attend to and read the messages

16   conveyed by the warnings.

17        So I think something within the ballpark of what you

18   have under the rule is necessary.  And if you were to get much

19   larger than that, you might well get into the realm of

11:09AM 20   unjustified or unduly burdensome, because it would no longer be

21   reasonably related to the government's interest, it might no

22   longer be supported by the record, by the literature, and you

23   could have, of course, also insufficient time or insufficient

24   space for the communication of the manufacturer's message.

11:10AM 25        THE COURT:  I may come back to that, the *Zauderer*

 1    framework, in a bit.  But I do want to be sure to ask about

 2    *Warner-Lambert*.

 3          In the 2012 DC Circuit opinion, there the court there

 4    noted that although the amicus states had suggested relying on

11:10AM 5    *Warner-Lambert* and limiting past section, that the FDA there

 6    did not frame that rule as a remedial measure for past

 7    deception claims.  Some of the amicus support here notes

 8    *Warner-Lambert*.  Did you clarify the extent to which the

 9    defendants are relying on *Warner-Lambert* in remedying past

11:10AM 10   deception in defending the agency action shown here?

11          MR. BAER:  So, yes, Your Honor.  We're relying on

12    remedying a past deception theory fully in the alternative

13    because we don't think it's necessary to reach that issue under

14    *Zauderer*.

11:11AM 15         And, here, the argument is that the lack of consumer

16    information about these negative health consequences stem from

17    a decade's long effort to try to either convince the public

18    that cigarettes are not dangerous or to muddy the waters.  I

19    believe during Mr. Watson's argument he suggested that there

11:11AM 20   was not evidence pointed to in our reply brief -- or sorry --

21    in our briefing regarding sort of this history.  And I would

22    just note that, in our reply brief, at page 5-2, we did cite,

23    for instance, administrative record 39,667, which describes how

24    tobacco advertising used, quote, key words such as smooth,

11:12AM 25   mild, to convey health related messages, and that it later

1    relied on imagery of active, healthy models for what was

2    characterized as a, quote, more subtle message about health.

3    Which is, again, just more evidence that the tobacco history

4    has a history of using its speech to suggest that cigarettes

11:12AM  5    are not connected to health risks and are consistent with a

6    healthy lifestyle, and it's from sort of that kind of

7    foundation of misinformation that the public may be

8    under-informed about any number of particular health risks

9    associated with smoking.

11:12AM 10         THE COURT:  Let me try to present my understanding of

11   plaintiff's slippery slope argument, and then the ultimate

12   question is what assurances can you offer that you understand

13   it and that it is not as slippery as the plaintiffs say it is.

14         The plaintiff's argument is, essentially, that if the

11:13AM 15   interest required by either *Zauderer* or *Central Hudson* is

16   something like reducing smoking, and a certain set of warnings

17   has not been shown to sufficiently further that interest to

18   justify compelling those warnings, that if the government can

19   then redefine the interest as simply promoting education, which

11:13AM 20   is one of the means of reducing smoking, and then say that the

21   same warnings are effective to promote education, that the

22   interest requirement, substantial interest requirement, is

23   effectively undermined.

24         I think your response is something to the effect of

11:13AM 25   sometimes the government can have different levels of interest,

1    and public health might be the broadest conception, and

2    reducing smoking would then be a subset of that or a means to

3    improve public health, and promoting education is also a means

4    of reducing smoking.  And that you would, I assume, argue that

11:14AM  5    sort of the means end test doesn't really have any conceptual

6    support or significance, since you can always abstract up or

7    down, higher, to a more abstracting or less abstracting

8    interest.  But, nonetheless, that argument troubled the DC

9    Circuit in the 2012 decision.  It seemed to have troubled

11:14AM 10    then-Judge Kavanaugh in his "may" occurrence.

11          So do you understand the concern, and what's your best

12    response about limiting the concern?

13          MR. BAER:  So, candidly, Your Honor, I somewhat

14    understand plaintiff's concerns.  But I think the principal

11:14AM 15    response is that if the government is choosing to justify

16    warnings purely on the basis of the information that it

17    conveyed in informational interests, then it's sort of have to

18    put up or shut up on the significance of that information and

19    the degree to which the warnings actually achieve it, as

11:15AM 20    distinct from, to go back to the then-Judge Kavanaugh's

21    concurrence in AMI, situations where you could imagine the

22    government having to make some sort of showing or estimate as

23    to effect on behavior in order for that interest to be

24    sufficient.  Because absent some test on behavior, it's not

11:15AM 25    clear; it's hard to see why that information has significance.

1   So contrasting, again, kind of the consumer curiosity versus

2   the sort of fundamental public health or democracy-preserving

3   aspect of the information that we've been discussing earlier.

4       I guess the other point that I would note is that

11:15AM 5   changing the focus of the interest, it's not just a matter of

6   abstracting up or down; it leads to different substantive

7   results.  So in the DC Circuit's decision in RJ Reynolds I, it

8   pointed to the specific aspect of the warnings at issue there

9   that it found concerning and indicative of advocacy consistent

11:16AM 10  with an effort to try to dissuade people from smoking.  So

11  things like appending the phone number 1-800-quitnow to each

12  one of the warnings, or one warning had an image of a man with

13  an "I quit" T-shirt on it, the court took those inclusions very

14  seriously and found that that was part of the sort of

11:16AM 15  antismoking brow-beat consumers into quitting advocacy that it

16  found ultimately doomed the rule there.

17      Of course, here, you have a process that was geared

18  exclusively around promoting greater public understanding of

19  the negative health consequences of smoking, and so the warning

11:17AM 20  text images are focused on ensuring that the images are

21  concordant with the textual warning in a way that promotes

22  consumers' ability to understand the negative health

23  consequence at issue.

24      So to sort of return to the question of descending down

11:17AM 25  the slippery slope, I don't think it's all sort of one

11:17AM 1  continuum or one straight line from behavior to information,

2  because I think if the government is focused on different

3  aspects of the problem the results can be different within

4  different implications for a manufacturer or other economic

5  entities' speech, as I think there are here, in ways that are

6  meaningfully different from the implications that were at issue

7  in the first RJR case.

8       THE COURT:  Part of the justification for this rule and

9  the warnings on this rule is promoting consumer awareness of

10  some of these specific consequences that the FDA found did not

11  have as high of awareness absent these warnings, like COPD,

12  diabetes.  If that's part of the justification, then what is

13  your argument that this was a sufficiently narrowed way of

14  doing that, when public information campaigns by the government

15  focused on those specific health consequences could be tried or

16  enhanced without the burden on the expression of manufacturers?

17       MR. BAER:  So, several arguments there, Your Honor.

18       The first is the threshold.  That the framing of that

19  question in the way plaintiff had talked about this issue in

20  their briefing and in argument today sort of suggests an

21  obligation to kind of consider, you know, the various

22  alternatives to some extensive degree.  *Zauderer* itself, I

23  think, forecloses that by noting when you're within the realm

24  of *Zauderer* applying you don't have to consider every possible

25  alternative in the way you might of a First Amendment context.

1          In particular, the language I'd like to focus on comes

2     from *NIFLA*.  Because in Mr. Watson's argument, he talked about

3     public advertising campaigns there as being a reason that the

4     court struck down one of the disclosure requirements at issue

5     in *NIFLA*.  But as we noted in our reply brief -- and as I don't

6     take Mr. Watson to have responded to in his argument this

7     morning -- there were two disclosures at issue in *NIFLA*, a

8     disclosure for licensed clinics and a disclosure for unlicensed

9     clinics.  The disclosure for licensed clinics concerned

10    services that the state of California provided elsewhere, so it

11    concerned not the disclosures at the particular licensed

12    clinic.  And so the court found that *Zauderer* as a threshold

13    matter did not apply to the disclosure for licensed clinics

14    because the required disclosure didn't concern that clinic's

15    own products or services, and that, as a result, a higher level

16    of scrutiny would apply.

17          In applying that higher level of scrutiny, the court

18    then observed that there wasn't evidence about the efficacy of

19    public information campaigns, and that ultimately doomed the

20    disclosure requirement for the licensed clinics.  But, again,

21    it did so not under *Zauderer* but under a more heightened form

22    of scrutiny.  The court -- by that point in the analysis, *NIFLA*

23    had already ruled out the prospect of applying *Zauderer*.  So I

24    don't think that kind of in-depth comparison of public health

25    campaigns on the one hand to the warnings we have here on the

1  other is required under the case law, and I don't know that the

2  plaintiffs have cited any cases to the contrary.

3       So even if that level of comparison were required, I

4  think FDA has met its burden; because as is explained in the

11:21AM 5  rule, even if public health campaigns can be affective for

6  certain purposes, they are not -- they don't achieve the sort

7  of decades-long recognized congressional interest in ensuring

8  that every package of cigarettes contain a warning, which

9  ensures that every individual who smokes or potentially smokes

11:21AM 10  who picks up a package of cigarettes is going to be informed

11  about the negative health consequences of doing so.  In order

12  words, there's sort of a one-to-one correlation between

13  individuals who are picking up packages of cigarettes and

14  individuals who are exposed to that information, in contrast to

11:21AM 15  a public health campaign which can't reach as broadly or as

16  universally.  And so I think that --

17       THE COURT:  I appreciate, the government would love to

18  co-opt every product's marketing at the billboard because it's

19  more affective.

11:21AM 20       Let me move to a separate question.  Just as a

21  hypothetical, but assume that it was beyond big.  That no

22  matter how informed the public was about all of the specific

23  health consequences of viewing a product, that some percentage

24  of the public was just always going to make the decision to use

11:22AM 25  the product, for whatever benefits they perceived, personal,

1    social, whatnot, such that any increased warnings, which might

2    promote more awareness of specific consequences, but given a

3    product's addictive nature or just the nature of a personal

4    decision making it wouldn't actually change any decisions on

11:22AM 5    the grounds to use, and therefore to curb the health

6    consequences of the product.  Is the government arguing that

7    there would be a substantial government interest in -- again,

8    this is a hypothetical -- hypothetically, completely useless

9    increased awareness of health consequences?

11:23AM 10         MR. BAER:  So, Your Honor, I would say that the

11   government would defend the government's interest in requiring

12   those disclosures, but I especially take issue with the word

13   useless there.

14         THE COURT:  This is a hypothetical.  I appreciate that

11:23AM 15   you're raising arguments that there are uses here to consumer

16   awareness, so let me be more precise.

17         Is there a substantial government interest in increasing

18   consumer awareness of consequences of using a product when it

19   is hypothetically established beyond any doubt that that

11:23AM 20   awareness will not change any decisions to actually use the

21   product and, therefore, incur the negative health consequences

22   that the education is about?

23         MR. BAER:  Yes, Your Honor.  A disclosure would be

24   justified there, and I'll explain why.

11:24AM 25         As Your Honor noted, that sort of hypothetical is

1   consistent with, for instance, a perfectly addictive product;

2   right?  One where, once you have a tried it once, it's

3   impossible to ever cease using it.  So if we imagine that kind

4   of hypothetical product being the one we're talking about, then

11:24AM  5   I absolutely do think that there is a substantial governmental

6   interest in ensuring that individuals who are forever addicted

7   to a product that is causing heart disease, causing bladder

8   cancer, causing cataracts, deserves to know the consequences of

9   that addiction.  Now, that may be a sort of a tragic knowledge,

11:24AM 10   tragic reality.  And you could imagine individuals using that

11   information in any number of ways in terms of how they think

12   about the course of their life and what to expect and what to

13   mentally prepare for, and I could imagine any number of ways in

14   which that is still essential information for consumers.

11:25AM 15       THE COURT:  Wait.  So you're arguing that even if the

16   increased awareness doesn't actually change the health

17   consequences, there's a use in allowing the people to, like,

18   you know, create wills and get funeral insurance?

19       MR. BAER:  I'm sort of talking more broadly than that,

11:25AM 20   Your Honor.  Just that, yes, if you are addicted to a product,

21   you deserve to know what it's going to do to you, and that

22   could be for any number of reasons.  Maybe it's long-term

23   planning.  Maybe it's just in terms of your own mental

24   preparation for what to expect in your life about the pain that

11:25AM 25   you may suffer or the surgical procedures that you're going to

1   go through.  Maybe it's so that you get earlier screening for

2   particular cancers or particular diseases.  Again, you know,

3   separate and apart from purchasing decisions, information about

4   what is going to happen to your body because of a product that

11:26AM  5   you consume, I think, absolutely, that's valuable information

6   and one that the government has an interest in ensuring that

7   individuals are presented with.

8        THE COURT:  I think I understand.  You're just kind of

9   moving a little bit away from my hypothetical and drawing it

11:26AM 10   back to this case -- which is fair, since this is the case at

11   hand -- in arguing that it would help users mitigate the health

12   consequences or prepare for them.  Right?

13        MR. BAER:  So, yes.  Although, to be fair, Your Honor, I

14   wasn't trying to place a hypothetical, at least in this

11:26AM 15   particular line of questioning.  Because as I understood the

16   hypothetical, the key premise is that it doesn't affect

17   purchasing decisions of the product to which the warning is

18   appended.  Again, my point is, as you could imagine, there's

19   any number of other ways in which it still affects the

11:26AM 20   consumer's life choices and mental processes.

21        THE COURT:  So, here, the government is not making the

22   argument that even one fewer smoker is enough, even one life

23   saved is enough, or one fewer user is enough, which one could

24   perhaps understand the appeal of that, but that's not the

11:27AM 25   argument the government's drawing on to justify these warnings.

1    Instead, it's we don't have to demonstrate that there will be

2    even one fewer user.  It's, even for those who use it, there is

3    a substantial government interest in better appreciating more

4    widespread appreciation of the consequences, and that that's

11:27AM  5    justified by those other ends that you mentioned:  Preparation,

6    mitigation, et cetera.  Is that accurate?

7        MR. BAER:  I think, broadly, yes, Your Honor.  Although

8    I I would add that, in transitioning from the hypothetical back

9    to this case, it is also important to keep in mind the

11:27AM 10    individuals who don't yet smoke.

11        And now, going back into the hypothetical realm, even

12    for them, even if you were to assume that their decision isn't

13    affected by the information that's being provided here, sort of

14    going in eyes open to the choice, kind of again like, you know,

11:28AM 15    someone's going to go under the knife for surgery, even if it's

16    inevitable that they are going to choose surgery, knowing the

17    risks, the government has a substantial interest in ensuring

18    that they do know those risks before they make a potentially

19    consequential decision.

11:28AM 20        THE COURT:  Yes.  But, again, presumably, that's because

21    the whole idea of informed consent is that it would, in theory,

22    if the information was about harms, it would allow people to

23    make a different choice.

24        And I just want to be clear.  You're not defending these

11:28AM 25    rules on the idea that without the warnings you can demonstrate

1    that some number of people would make a different choice,

2    either not to start smoking or not to continue smoking.  You're

3    not making that argument.  You're just arguing that there's

4    still substantial government interest even if you don't show

11:29AM  5    that one person would be able to start or cease smoking in

6    disseminating awareness of these consequences for the other

7    reasons you mentioned, allowing mitigation of the consequences,

8    and, as you said, planning for them in terms of changing

9    lifestyle choices.  And I think you mentioned it would also be

11:29AM 10    preparing in whatever ways people prepare.  I took that to be

11    an allusion to planning, financial planning, family planning,

12    whatever, for the consequences.  That's the argument the

13    government is presenting here?

14         MR. BAER:  That's certainly a part of the argument.  I

11:29AM 15    would say that, in terms of the planning that I was alluding to

16    a moment ago, I think it is broader than the sort of financial

17    consequences.  I sort of meant it not to get too philosophical,

18    but on a more fundamental level of just sort of understanding

19    in that sort of psychological way that "this is what may well

11:30AM 20    happen to me because of this choice," and not feeling

21    blind-sided when it comes about.

22         Again, I should note and say that for all of these sort

23    of ways in which individuals could imagine using this

24    information, I'm not trying to suggest that we are sort of

11:30AM 25    encompassing the full universe of ways in which information is

 1    valuable.  I'm sort of trying to provide the intuitive

 2    underpinnings for why we tend to think that that information is

 3    valuable; why it's important that individuals be able to make

 4    informed choices and why that interest exists if we were to be

 5    certain that they wouldn't change their behavior.

 6        But to be clear, of course, facilitating the ability to

 7    change behavior and providing -- arming individuals with

 8    information that can allow them to choose a different course is

 9    a core part of the value of the information that's being

10    presented here; and so, in that sense, I don't know that it's

11    distinct from the informed consent requirements for surgery.

12    Because, while, yes, people may choose not to undergo surgery,

13    and that's part of the value why we think informed consent is

14    important, because it allows them that choice, my argument is

15    simply, in the informed consent context, we don't need to

16    predict the extent to which individuals will or will not choose

17    to have the surgery based on the information because we still

18    think there's an inherent value to them being fully informed

19    before they make the choice, and it's the same thing here.

20        THE COURT:  Right.  That argument goes to the question

21    of what can count as a substantial interest.  And then, of

22    course, *Zauderer* still does have the unduly burdensome

23    argument.

24        And to continue the comparison, in the informed consent

25    to surgery context, at least as far as I'm aware, it's not

1    typical to see large overwhelming parts of marketing materials

2    for waiver or anything like that have graphic depictions of

3    negative health consequences that could result.  Whereas, here,

4    the rule requires the top 50 percent of the front and back of

11:32AM  5    all cigarette packages to have the graphics and textual

6    warnings.

7         The Seventh Circuit in *Blagojevich* held that a four-inch

8    square sticker was not narrowly tailored because it covered a

9    substantial portion of the box.  How is this any less

11:32AM 10    burdensome than the sticker at issue there?

11         MR. BAER:  So let me take each example in that question

12    in turn, Your Honor, if I may.

13         Starting with the informed consent context, I actually

14    think that's a very useful example.  Because, of course, there,

11:32AM 15    while advertisements for the procedures may not contain the

16    sort of large warning, the informed consent takes place via a

17    conversation with a medical professional.  And if before

18    someone purchased each pack of cigarettes, they had to have a

19    conversation with a medical professional about the risks of

11:33AM 20    purchasing that product and consuming it, then I think there

21    would be a much stronger argument that these warnings are not

22    necessarily.  Or similarly, if people purchased surgeries

23    behind the counter of a convenience store, I think it

24    absolutely would be likely justified that the consequences of

11:33AM 25    those surgeries be depicted in clear terms that people paid

1    attention to and understood.

2        Whereas, turning to the Seventh Circuit example, where

3    you had a four-square inch label or disclosure on video game

4    labels, there, the principal difference is the court was

11:34AM 5    applying strict scrutiny.  This gets to the question of whether

6    information is purely factual or uncontroversial versus whether

7    it's a form of speech, compelled speech that requires some

8    level of heightened.  There, because 18 was the label designed

9    to signal that material is sexually explicit, the court

11:34AM 10   conducted an exhaustive analysis there of why that sort of

11   determination, that finding, was an inherently subjective

12   judgment, not purely factual and uncontroversial.  And,

13   therefore, any requirement that it be disclosed or appended to

14   a product had to be justified according -- in accordance with

11:34AM 15   the provision for scrutiny, including, of course, strict

16   scrutiny and the narrowed tailing requirement.

17       So I think the biggest difference is -- there are other

18   differences, but I think the most significant one is the court

19   was using a different analytical lens than should be used here.

11:35AM 20       THE COURT:  Let me ask this, which is a question about

21   the limits of your position.  On footnote 26 of the District of

22   the DC's 2011 decision, where the court raised the issue of

23   what limits on fast food packaging or labeling would be

24   permissible under this theory, and focused on the

11:35AM 25   burdensomeness aspect of the *Zauderer* test.

1          As you know, a number of years ago, the government

2     required that fast food restaurants display calorie counts for

3     fast food.  And, nonetheless, the National Institute For Health

4     has found that the obesity epidemic continues in the United

11:35AM   5     States.

6          So given those findings, would your theory allow some

7     component of HHS to require that fast food packages display a

8     graphic warning tacking up 50 percent of the wrapping or

9     containers for fast food with a picture, the same picture

11:36AM  10     that's present here, about Type 2 diabetes raising blood sugar

11     and someone doing a blood prick test, would that be justified

12     on your view as not unduly burdensome, on giving an argument

13     that increasing awareness of this consequence is still required

14     given the continuing need and the inadequacy, in your view, of

11:36AM  15     higher, more linear labels?

16          MR. BAER:  So, Your Honor, I think that's a difficult

17     question to answer in the abstract because any such disclosure

18     requirements can only be constitutional in light of the record

19     that exists.  And as I sort of noted a number of frames ago in

11:37AM  20     our conversation with Your Honor, the record that we have here

21     includes decades of congressional findings -- or of

22     congressional efforts as well as findings about the evolution

23     of warnings on tobacco labels, and it also includes findings

24     about lack of knowledge about specific health consequences, and

11:37AM  25     findings about the efficacy of certain types of warnings in a

1    context of cigarette health warnings.  In other words, some of

2    the evidence in the record pertains specifically to what nature

3    and size warnings about cigarettes are most effective at

4    promoting understanding.

11:37AM  5        THE COURT:  So your answer is sort of -- just to

6    summarize, your answer is sort of potentially, depending on the

7    record.

8        MR. BAER:  Yes, though it's certainly much harder for me

9    to imagine any time in the near future that sort of record

11:38AM 10    being able to be compiled, if only because we don't have the

11    same length or degree of regulatory tension.

12        And I would also just note that, at sort of a high level

13    of abstraction, I understand -- I should say, I don't

14    understand there to be any bases -- there is not any safe usage

11:38AM 15    of cigarettes, and I don't understand that categorical

16    statement to be as true in the fast food context.

17        So, again, there are any number of reasons why I could

18    imagine regulators coming to a different decision about what

19    use is appropriate or necessary to warn about in that context.

11:38AM 20        THE COURT:  As part of that answer, you mentioned the

21    findings here about past this information.  Let me use that as

22    a transition point to ask you about a Fifth Circuit case, the

23    Fifth Circuit's 2011 decision in the Louisiana Disciplinary

24    Board, which seems to instruct the Court to begin its inquiry

11:39AM 25    by classifying the regulated speech as either deceptive,

1  potentially deceptive, or not deceptive.  That framework does

2  not seem to encompass past disinformation, unless the

3  regulation in question stamps out ongoing potentially deceptive

4  practices.

11:39AM 5      So does the Louisiana Disciplinary Board allow this

6  Court to consider past deception as part of classifying the

7  speech regulation in question?

8      MR. BAER:  So, candidly, Your Honor, I'm not familiar

9  with the specifics of Louisiana Disciplinary Board as you're

11:39AM 10  setting it out.

11      I will just note that, at least in terms of my initial

12  reaction, that classification is consistent with my

13  understanding of how courts often apply *Central Hudson* in terms

14  of thinking about which -- the sort of steps of *Central Hudson*,

11:40AM 15  and whether something is inherently misleading, then it's

16  something that is not subject to First Amendment protection;

17  and only if it's potentially misleading can there be

18  restrictions on the speech.

19      And so my initial instinct is that that framework makes

11:40AM 20  no sense in thinking about speech that the government can

21  restrict or prohibit rather than in sort of a disclosure

22  requirement context, because, again, as we've discussed

23  previously, I don't think that the *Zauderer* test can only be

24  geared towards instances of correcting for deception.

11:40AM 25      THE COURT:  Let me ask you to provide any concluding

1    argument on the First Amendment issue, and then turn briefly to

2    the APA Administrative Procedure Act issue.

3         MR. BAER:  So, Your Honor, I think we've covered most of

4    the bases on the First Amendment; but to sort of highlight, I

11:41AM 5    think, some of the key points.

6         Here, the warnings are purely factual and

7    uncontroversial because they are medically accurate depictions

8    of -- or medically accurate depictions of the health conditions

9    addressed in the warnings as they are typically experienced.

11:41AM 10        THE COURT:  I didn't go there with my questions, but

11   since you brought it up.  The image of neck cancer, even if a

12   neck cancer might look like that, is a neck cancer far beyond

13   where most neck cancers would be typically be caught and

14   addressed; correct?

11:41AM 15        MR. BAER:  So it may well be true that the majority of

16   individuals who suffer from neck cancer would receive treatment

17   before the tumor as depicted in that image is removed.

18        THE COURT:  Is it medically accurate, your hill to die

19   on here?  There's picture of a man sitting on a bed.  That's

11:42AM 20   not really a medical depiction of erectile dysfunction.  Why

21   are you choosing to emphasize that?

22        MR. BAER:  I think you're right, that it is not the hill

23   to die on here.  I think it is an important feature of the

24   warnings.  That they were developed in consultation with a

11:42AM 25   certified medical illustrator, and that they were designed to

1    depict, sort of devoid of extraneous context or information,

2    the particular specific health conditions addressed in the

3    warnings.

4         And the reason why that was the effort or the

11:42AM 5    undertaking is -- again, as I understand it, undisputed

6    evidence in the record -- that cigarette health warnings that

7    combine text and images are better at promoting understanding.

8    The FDA in the rule pointed to a robust body of findings in

9    literature showing that cigarette health warnings that combined

11:43AM 10    images and text promote understanding of the negative health

11    consequences of smoking.  And so, there, you have both the

12    concepts that images enhance the message that the text conveys

13    and helps ensure that it gets noticed and comprehended.  And

14    so, again, sort of -- we've already discussed why images are

11:43AM 15    valuable for individuals who may not be able to speak the

16    language or read the language that the text is written in.  But

17    for the majority of individuals who would be reading or

18    observing these warnings who can both read the text and see the

19    images, for them, it improves understanding to have a supported

11:43AM 20    image linked to the text.

21         I think the only sort of last point I would make on the

22    purely factual and uncontroversial prong of the inquiry just

23    goes to the question of emotion, because plaintiffs

24    consistently talk about how these warnings may be perceived by

11:44AM 25    the public and whether individuals may have an emotional

1   reaction to them.  But I think even in the colloquy with

2   Mr. Watson that Your Honor had earlier this morning, there was

3   sort of a recognition that when you're dealing with

4   particularly dangerous substances or products, that even a

11:44AM 5   factual statement of the risk can, of course, provoke an

6   emotional reaction.  It is a factual statement that tobacco

7   smoke can harm your children.  Telling that to a parent may

8   provoke an emotional reaction because no one wants to think

9   that their actions are harming their children.  But that

11:44AM 10   doesn't render the ensuing warning any less factual or render

11   it controversial, just because the stakes are so high.

12        And I think that is why plaintiffs spent so much time

13   focusing on the emotional reaction, rather than really getting

14   at FDA's intent.  And the sort of language from RJ Reynolds I

11:45AM 15   from the DC Circuit's 2012 decision that plaintiff highlights,

16   by contrast, does place the focus on the agency's intent if the

17   presence -- or in terms of whether or not an emotional reaction

18   is something that should cause a court any First Amendment

19   concerns.  That sort of trying to convey the subjective values

11:45AM 20   or judgments, one way that you might be able to tell that the

21   government is doing that is that the government is just trying

22   to evoke an emotional reaction rather than to convey purely

23   factual and uncontroversial information.

24        So I, respectfully, don't think this is a useful metric

11:45AM 25   in determining whether these warnings fit into the purely

1    factual and uncontroversial part of the *Zauderer* analysis to

2    ask, well, do people have emotional reactions to learning

3    information about the dangers of cigarette smoking.  I think,

4    as we noted in our brief, that's more likely to be a reaction

11:46AM  5    to the dangers of smoking than it is to anything that is

6    unfactual or controversial about the warnings that the FDA has

7    selected here.

8         THE COURT:  If you could just briefly turn to your

9    notice and comment and arbitrary and capricious and to the

11:46AM 10    plaintiff's challenges on those grounds, and specifically talk

11    about why did FDA withhold the qualitative study reports, and

12    should the Court be concerned that interested parties had only

13    15 days to comment on the multi-hundred page documents?

14         MR. BAER:  So, Your Honor, starting with the second part

11:46AM 15    of that inquiry, the answer is no, I don't think the Court

16    should be concerned that interested parties had 15 days to

17    comment on, I believe it was a total of four documents

18    totalling less than 600 pages, when they had four times that

19    time for well more, and four times that volume of information

11:47AM 20    for the entirety of the information that was on the public

21    document.

22         And I respectfully suggest that, if anything, having a

23    targeted 15-day period for just these four qualitative study

24    reports likely allowed them to receive even more attention in

11:47AM 25    the docket then they may otherwise have received if they were

1    up along with every other piece of information that was

2    available during the rule making docket for the 60-day period.

3           Therefore -- sorry, I didn't mean to interrupt Your

4    Honor.

11:47AM  5       THE COURT:  Please, go ahead.

6           MR. BAER:  Of course, here, as we note in our brief, the

7    case law that the plaintiffs cite that suggest that this period

8    is inappropriate or is somehow insufficient pertained to

9    comment period at large for the entire rule making; not the

11:48AM 10   sort of supplemental period that is focused on a

11   specific subset of information, as happened here.

12          Moreover, I would note -- and this sort of leads

13   naturally into the point that even if Your Honor were to agree

14   that that period wasn't sufficient under the APA, I think it

11:48AM 15   would certainly still be subject to the harmless error argument

16   because plaintiffs have not shown substantial prejudice from

17   having 15 days to comment, as evidenced by their argument here,

18   which rely on and reflect the same characterization of those

19   qualitative study reports for the comment period.  There's

11:49AM 20   nothing material to their advocacy and certainly nothing that

21   would suggest the underlying decision the FDA made would change

22   if they had been given more than 15 days to comment on these

23   four reports.

24          THE COURT:  Well, the plaintiffs note a memo to file

11:49AM 25   included in the administrative record where the FDA explained

1    that it did not disclose some of the raw data in question

2    because doing so would allow third parties to analyze the data

3    differently and in ways other than what FDA prespecified.  Your

4    footnote responding to that point called it irrelevant.

11:49AM 5         But isn't allowing interested parties to comment on

6    potential different readings of data one of the core purposes

7    of notice and comment procedure?

8         MR. BAER:  So giving interested parties the opportunity

9    to comment on the substance of the proposed rule where a

11:50AM 10   description of the subject and issues involved is the

11   touchstone of the notice and comment period, and that language

12   comes from the APA itself at 5 USC 553(b)(3).

13        But, here, the agency more than satisfied that

14   obligation through providing the text of the study reports,

11:50AM 15   which in exhaustive detail walked through how the studies were

16   conducted, the justification for the measures that the agency

17   selected, and an analysis of the results and findings; and I

18   think, in terms of providing the ability to comment that the

19   APA provides, providing those study reports.

11:51AM 20        And I would just note that the quantitative study

21   reports were part of the initial rule making docket.  And,

22   there, that was because they were sort of central to the rule

23   making undertaking rather than sort of ancillary developmental

24   parts of the process.

11:51AM 25        Having the opportunity to review and comment on those, I

think, was more than sufficient, as evidenced by the fact that
although plaintiffs suggest that being denied the raw study
data from the quantitative study reports prejudices them, they
don't actually cite any of the raw study data, any of the raw
quantitative study data in their briefing.  They attach it,
what they describe as a second appendix, that includes quotes
from qualitative studies, but I don't understand them to be
using those quotes in a manner that is materially different
from how they used the qualitative study reports, which
accurately summarized and previewed many of the quotes that
they have excerpted from the qualitative study transcript
themselves.

      But then, on the quantitative study raw data, there's
just nothing from plaintiffs.  And so, certainly, there, they
have not carried their burden to demonstrate that any error
wasn't harmless.

      But, again, as we were discussing a moment ago, I don't
think there was any error here, given the level of detail that
was provided in the reports, which I think is what
distinguishes this case from others where a lack of data has
been cited as a reason that an agency didn't comply with the
notice and comment requirement.

      We cite in our brief the Fifth Circuit's *Chemical
Manufacturers Association* case.  And, there, you had a
situation in which the EPA withheld -- not to violate the

 1   notice and comment requirement even though it didn't provide

 2   the data from an economic impact study that it used, because it

 3   had appropriately disclosed the method the EPA followed -- the

 4   data it proposed to rely on and its intention to develop an

 5   economic impact study but then didn't disclose the ultimate

 6   data it did rely on, and the Fifth Circuit found that that

 7   wasn't a notice and comment violation.  And I think the same

 8   reasoning applies, of course, here, where, given plaintiffs and

 9   other members of public were given adequate notice of how the

10   studies were being conducted and what the FDA had found, that

11   that's sufficient to have allowed all of the comments that the

12   agency, of course, did receive, and to allow the arguments that

13   have been repeated in the litigation here.

14        Your Honor, you'd mentioned --

15        THE COURT:  Go ahead and wrap up.

16        MR. BAER:  I would just briefly like to touch on the

17   other APA argument that Mr. Watson dealt with explicitly, which

18   is just a question of the cost benefit analysis and whether the

19   agency conducted an adequate one.  I think this argument is

20   addressed sufficiently in the briefs.

21        I would just note that the plaintiff's briefing and in

22   argument today, it still has not mentioned the *Nicopure Lab*

23   case from the DDC at 266 F.Supp.3d 360, where, at page 406, the

24   court considered exactly this argument, the question of whether

25   FDA specifically was entitled to use a break-even approach in

 1    its cost benefit analysis.  And, there, the court highlighted

 2    that there was, quote:  No statutory duty to quantify the

 3    benefits at all; and that even if such a duty could be implied,

 4    there's no requirement that the -- sorry -- that there was no

11:55AM  5    requirement that the benefit be quantified in any particular

 6    way when compared to the cost.

 7         So, here, there's no argument that plaintiffs have

 8    raised that the agency was required under the Tobacco Control

 9    Act to conduct a particular form of cost benefit analysis.  In

11:55AM 10    the final regulatory impact analysis, the agency explained why

11    the particular benefit at issue in this rule that the agency

12    was pursuing -- mainly, this sort of public understanding

13    benefit that we've been discussing -- are difficult to monetize

14    and to quantify.

11:55AM 15         And so, there, the purpose of a cost benefit analysis is

16    to distil the trade-offs at issue for a decision maker,

17    providing a break-even approach that says:  This rule equals

18    and benefits the monetary amount of the cost if you ascribe one

19    nth of value to each cigarette package that contains the

11:56AM 20    disclosure.  I think that framing was certainly permissible and

21    well within the bounds of the APA.

22         THE COURT:  When the government issued rules requiring

23    disclosure of calorie counts at fast food restaurants, or, for

24    that matter, on cereal boxes and other items of food, did it

11:56AM 25    conduct a cost benefit analysis of any sort or purport to

 1   analyze whether the disclosure of that information would lead

 2   to fewer calories consumed?

 3          MR. BAER:  Candidly, Your Honor, I'm not sure, one way

 4   or the other.

 5          THE COURT:  Just on remedy, quickly, you argue

 6   severability.  Hypothetically, if it were the case that the

 7   graphic component of these labels is what lead them to fail,

 8   first, administrative scrutiny, how could they be severed and

 9   the rest the rule be maintained?

10          Presumably, the 50 percent requirement was tied to the

11   graphics, so that would presumably have to be struck down,

12   again, hypothetically, assuming that what made them unduly

13   burdensome was the graphics.  So how would the rule operate, on

14   your view of severability and assuming my hypothetically stated

15   view of the merits?

16          MR. BAER:  So, Your Honor, I would say two things to

17   that.  And the first may cite part of that hypothetical, but

18   then the second will attempt not to so cite.

19          First is I think if you were to strike just the images,

20   then the rest of the rule would still sort of function and make

21   sense as a whole and would go into effect.  And by that I mean

22   the statutory requirements as to size exist independent of the

23   requirement that there be graphics included, and therefore the

24   size requirements and the textual warning statements that the

25   FDA issued and assessed and determined to promote understanding

1    of the negative health consequences of smoking better than the

2    false statements of the EPA.  Those statements emphasized, as

3    specified in the statute, would go into effect.  And so I think

4    that would be a very clean way, if Your Honor were to decide

11:58AM  5    that the rule needs to be severed, to do so.

6         And, of course that specific possibility was

7    contemplated by the agency in the text of the final rule here.

8    This is a case where you have extraordinarily clear

9    congressional and agency commands regarding severability, and

11:58AM 10    the agency specifically considered the possibility of all the

11    images being severed.

12         If Your Honor were to conclude that both the size and

13    the image requirements are invalid and need to be severed, then

14    I think the remaining textual warning requirements would go

11:59AM 15    into effect, and I guess it would depend a little bit on the

16    nature of Your Honor's ultimate opinion of sort of how exactly

17    that would operate or function.  And I sort of respectfully

18    suggest that if it were to get to that particular point or

19    decision note, perhaps the best way to address the issue would

11:59AM 20    be through sort of supplemental briefing.

21         But for the reasons we've been discussing, I don't think

22    we need to get to that contingency.

23         THE COURT:  One final question, which is a little bit

24    imprecise but broadly falls under the category of:  Is there

11:59AM 25    anything else like this?

1     And a more precise formulation would perhaps be:  Can

2  you provide citations to any other product or service labeling

3  warning requirement in this country's history that is like --

4  not in the sense that it precludes a graphic, because I

12:00PM 5  understand the skull and crossbones on poisoning is graphical

6  in that sense -- but in the sense that it takes up half of any

7  one surface of the wrapping or advertising for that product,

8  and includes images that are expressly designed to sort of

9  communicate starkly the negative health consequences of the

12:00PM 10  product or service?  Is this the first warning requirement that

11  meets those parameters in the country's history, or am I

12  unaware of some other?

13     MR. BAER:  To my knowledge, Your Honor, this is the

14  first time that these kinds of warnings have been developed and

12:00PM 15  used.

16     And I think the sort of intuition for why that makes

17  sense is, first, just the nature of the product.  Just as Your

18  Honor's unaware of warnings that look like these, I'm unaware

19  of a consumer product that poses the magnitude and variety of

12:01PM 20  risks that cigarettes do.

21     THE COURT:  How about opioids?

22     MR. BAER:  So, there, opioids are prescription drugs.

23  And consistent with the conversation we were having earlier

24  about Your Honor's hypothetical regarding surgery, there's a

12:01PM 25  conversation with a prescriber.  If opioids were available --

1   and, here, I'm going to turn a little outside of my knowledge,

2   so I apologize if I misstate any of the sort of relevant sale

3   restrictions -- but if opioids were available with the same

4   degree of ease as cigarettes, and there had been a history of

12:01PM 5   insufficient warnings, promoting --

6       THE COURT:  Well, based on the epidemic in this country,

7   one could argue that they are so available.

8       MR. BAER:  Respectfully, Your Honor, although the -- by

9   no means do I wish to downplay the severity of the scale of the

12:02PM 10   opioid epidemic.  I don't think even taking, given how

11   significant that epidemic is, it would be fair to say that

12   those are as available as cigarettes are.  One can't go to a

13   convenience store counter and, you know, no questions asked,

14   purchase opioids.  And I think if one could, then the question

12:02PM 15   of whether these sorts of warnings would be justified.

16       That strikes me as potentially a close question and

17   perhaps a situation where you might also end up with this kind

18   of warning, again, given the magnitude of the risks and of the

19   harm.

12:02PM 20       THE COURT:  And I don't mean to venture too far down

21   that trail.  My primary question was just a factual one, to

22   make sure that I was not missing something in understanding

23   that this is the first time to see warnings that are like these

24   insofar as meeting the parameters that I've described.  So

12:03PM 25   thank you for your help with that.

1        I think we've drawn enough attention to my questions for

2   the defendants.  I want to know if either of the parties would

3   like another short recess for comfort at this point.

4        I would like to offer the plaintiffs a chance to respond

12:03PM  5   to the government's arguments, and then we'll wrap up.  Does

6   either party request a short recess?

7        MR. WATSON:  Your Honor, this is Mr. Watson.  I would

8   appreciate the opportunity for rebuttal.

9        I'm happy to take a recess or to keep going, whatever is

12:03PM 10   more convenient for the Court and for Mr. Baer.

11        THE COURT:  Not hearing that you request one, Mr. Baer,

12   are you content to continue without a recess?

13        MR. BAER:  I am, Your Honor.  Though, likewise, defer to

14   the Court and to Mr. Watson.

12:04PM 15        THE COURT:  Well, then, let's just continue.

16        Mr. Watson, I'd like to give you the opportunity to

17   respond to any of the government's arguments this morning.

18        MR. WATSON:  Thank you, Your Honor.  I'd like to just

19   quickly circle back to a few of the issues that have been

12:04PM 20   discussed this morning.

21        First, with respect to the hypothetical possibility of

22   severing to include text only warnings, I'd like to note three

23   quick things.

24        First, that would still be unduly burdensome.  In

12:04PM 25   *American Beverage*, the Ninth Circuit, en banc, recently

1  invalidated under *Zauderer* a text only requirement that applied

2  to just 20 percent of the ads, which is far less burdensome

3  than the warnings here.  Here, the government hasn't even tried

4  to justify including on the front and the back.

5      Secondly, the government's main study didn't even test

6  whether a text only warning of any size, let alone on both

7  sides of the package, would materially advance any interest, so

8  the government hasn't carried its burden to justify text only

9  warnings here.

10      Third, on a practical note, this would take a long time

11  to implement, and the cigarette manufacturers would need the

12  full 15 months because they would have to start from scratch in

13  redesigning the packages and the like.

14      Now, as to the value of the information in the

15  warnings -- even the government concedes, at page 14 of its

16  reply brief, that the information must have value; and it said

17  here, today, that they must put up or shut up.  But they have

18  not put up.

19      And two quick points on that front.

20      In addition to the points I made in my principal

21  argument, it's important to note that Dr. Klick found, by

22  analyzing FDA's own data, that acquiring knowledge of the risks

23  addressed in these warnings would have zero effect on smoking

24  and would generally have no effect even on people's assessment

25  of the risks of smoking.  And FDA doesn't actually know the

1    informational value because it doesn't know what message the

2    public is receiving.  It didn't test that.  The new information

3    on which they hang their hat largely on didn't reveal which

4    message or health affects the viewers took away from the

12:06PM 5    warning; and, indeed, they could have taking away a misleading

6    or inaccurate message.

7         Just to give an example, the head and neck cancer

8    warning that Your Honor referred to suggests that head and neck

9    cancer always occur from smoking and that it often results in a

12:06PM 10    lump of that size.  And that is misleading because the

11    government, even on its own terms, is saying, well, that would

12    be true if the person didn't have access to medical care, which

13    is an issue not addressed in those warnings.

14         There was discussion in both parties' arguments about

12:06PM 15    the *Warren-Lambert* case.  And I would just like to point out

16    that in over 100 pages of briefing by the government, they

17    never cite that case.

18         Mr. Baer noted also that there have been years of effort

19    by Congress and others to address these issues.  In response, I

12:06PM 20    would say that such efforts have been sufficiently effective in

21    informing consumers; they just haven't completely gotten all

22    consumers to quit.  So the FDA is now attempting to compel

23    antismoking advocacy, pure and simple, which would get strict

24    scrutiny review.  In any event, it's an antismoking advocacy

12:07PM 25    that has no effect in reducing smoking.  FDA couldn't show that

1    in 2011.  They didn't try to show it now.  We put in expert

2    evidence based on FDA'S data showing that it won't occur now.

3         As to the discussion about causal language, in

4    discussing the word "causes," just to clarify, we're not saying

12:07PM 5    that there is no correlation between smoking and various health

6    consequences.  What we're saying is that the use of the word

7    "causes" goes beyond that, and was misleading about the risk.

8    And, again, FDA's own study showed that this language was

9    problematic.  It was the most prevalent finding in FDA'S study.

12:07PM 10        Mr. Baer also pointed to the dictum from the *NIFLA* case

11    where the court included a caveat at page 2,376, that that

12    court doesn't, quote:  Question the legality of health and

13    safety warnings long considered permissible, unquote.

14         But I think there are three reasons why that one

12:08PM 15    sentence of dictum doesn't get the government anywhere in this

16    case.

17         The first is *NIFLA* doesn't say whether *Zauderer* applies

18    to these traditional warnings; it only says that they are

19    permissible.  So it's not even addressing the *Zauderer* question

12:08PM 20    for which the government pointed to this dictum.

21         Secondly, even if *Zauderer* applies to those traditional

22    warnings, the court provides no definition of what a health and

23    safety warning is.  And the definition surely can't include all

24    warnings touching on health and safety considerations, because,

12:08PM 25    most pointedly, that caveat by the *NIFLA* court didn't protect

1    the licensed notice that was at issue in *NIFLA* even though, as

2    the dissent in that case noted, the relevant statute was

3    justified, in part, by health and safety consideration.

4         And the third of the three reasons why this dictum in

12:09PM 5    *NIFLA* is unavailing here is that it is undisputed that these

6    graphic warnings are unprecedented.  They're not traditional

7    warnings long considered permissible.  The types of image, the

8    size and burdensome nature of these warnings, is unprecedented,

9    as the government even conceded today.  So they certainly

12:09PM 10   aren't warnings that have long been considered permissible.

11        We also addressed the skull and crossbones hypothetical

12   in several respects, and I just wanted to note that an

13   additional difference between the skull and crossbones and the

14   warnings we have here is that skull and crossbones might

12:09PM 15   potentially be okay for a poison warning where there's a risk

16   of immediate death in most cases, but that's a different

17   question than warnings for products whose long-term use may

18   have health consequences.  So it's a bit of an apples and

19   oranges in that respect.

12:09PM 20        Just two final points.  When we discussed preclusion

21   earlier, I just wanted to clarify that the preclusion issue is

22   only even relevant to the question of our constitutional

23   challenge to the TCA warnings provision.  That's what was at

24   issue in *Discount Tobacco*.  And, of course, for all the reasons

12:10PM 25   I said, preclusion doesn't apply here.  But I just wanted to

1    clarify that the scope of that discussion is limited to our

2    constitutional challenge to the statute.

3           And then my final point is just that the implications of

4    the government's theory here are unprecedented and are

12:10PM  5    far-reaching.  If the government's view is correct, then

6    *Zauderer* review would apply to things such as pictures of

7    diseased feet on fast food bags, pictures of mutilated cows on

8    packages of beef, and things of that nature.  That cannot be

9    right.  It's not only inconsistent with precedent and with RJR,

12:10PM 10    but it is inconsistent with First Amendment, first principles.

11           THE COURT:  Very good.  Thank you, Mr. Watson.

12           And given your engaged colloquy with the Court this

13    morning, I don't have any more questions for you on reply.

14    Thank you for your reply arguments.

12:11PM 15           Mr. Baer, for the government, if you would like to take

16    one minute or two minutes to respond to anything in the

17    plaintiff's reply only, you have that time now.

18           MR. BAER:  Your Honor, we've had a lengthy conversation

19    this afternoon -- or what is now this afternoon -- so I don't

12:11PM 20    need to take up much more of the Court's time.

21           I would just note one particular thing that I felt was

22    interesting that Mr. Watson said in his reply, which just

23    concerns the skull and crossbones image.  He said that would be

24    more appropriate in cases of immediate threat or risk of death

12:11PM 25    than something like cigarettes that has a more long-term time

horizon in which it causes distinctive health affects.  All I
would note there is, of course, the suggestion that that image
is appropriate in different contexts just reinforces the extent
to which plaintiff's framework for thinking that any image that
has multiple connotations can never be appropriate.  That
framework can't be right if Mr. Watson's sort of parsing of
immediate versus long-term death for skull and crossbones
images is correct because that implies, of course, an
engagement with an image and assessing a time horizon from an
image and all of these ways in which individuals have to
subjectively interact with an image.  And, of course, that's
part of any communication, whether via image or via text.  And
I just think it's interesting to note that the place for which
plaintiffs are comfortable sort of resting on acceptable images
in this case is an abstract one that is, of course, subject to
interpretation, but one that we all recognize intuitively falls
well within the bounds of what purely factual and
uncontroversial information includes.  So I think that sort of
concession and that use of that image as kind of the prime
example on the part of plaintiffs just reinforces why there's a
much wider range of acceptable images that exist and are
available for the government to use than the plaintiffs had
been otherwise willing to acknowledge or recognize.

        THE COURT:  Let me thank the parties for their
flexibility in accommodating the telephonic nature of today's

1    hearing and for the responsiveness to the Court's questions.   I

2    believe I have a better understanding of your positions as a

3    result, and I thank you for that.

4        With that, this hearing is adjourned, and the motions

5    will remain under submission.   Thank you.

6        MR. WATSON:   Thank you, Your Honor.

7        MR. BAER:   Thank you, Your Honor.

8        MR. PERRY:   Thank you, Your Honor.

9        [PROCEEDINGS CONCLUDED]

10

11              OFFICIAL COURT REPORTER'S CERTIFICATE

12

13       I (we) certify that the foregoing is a correct

14   transcript of proceedings in the above-entitled matter.

15

16

17                                 */S/ Susan A. Zielie, RMR, FCRR*

18                                 Susan A. Zielie, RMR, FCRR
                                   December 27, 2020
19

20

21

22

23

24

25